DA 06-0520

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 377

FILED

November 17 2008

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BITTERROOT RIVER PROTECTIVE ASSOCIATION, INC.,

       Plaintiff and Appellant,

MONTANA DEPARTMENT OF FISH, WILDLIFE AND PARKS,

       Involuntary Plaintiff and Appellant,

    v.

BITTERROOT CONSERVATION DISTRICT,
a political subdivision of the State of Montana,

       Defendant and Appellee,

WALTER R. BABCOCK, BITTERROOT SPRINGS RANCH,
TUCKER CROSSING RANCH, and VALLEY SPRINGS RANCH,

       Intervenors - Third Party Plaintiffs and Appellees,

MARNELL CARRAO ASSOCIATES, INC.,

       Intervenor - Third Party Plaintiff and Appellee,

JOHN & KATHY LEWIS, MILLIE & CASEY DIEFFER,
EDITH L. & SKIP WARK, EDWIN C. & JUDITH
HEBNER, SUSAN A. & LARRY LEVENSTEIN,
MICHAEL & PAULETTE SPAULDING, EVELYN
L. LOCKE, DAVID J. ODELL, GREG & NANCY
TRANGMOE, JOHN & PATRICIA COOK, JOHN &
ELIZABETH FOX, ETNA DITCH COMPANY,
WEBFOOT DITCH COMPANY, and UNION DITCH
COMPANY,

       Intervenors and Appellees,

MONTANA FARM BUREAU FEDERATION,

       Intervenor and Appellee,

    v.

RAVALLI COUNTY COMMISSIONERS,

       Third Party Defendant and Appellee.

APPEAL FROM:    District Court of the Twenty-First Judicial District,
In and For the County of Ravalli, Cause No. DV-03-476
Honorable Ted L. Mizner, Presiding Judge


COUNSEL OF RECORD:

     For Appellant:

         Robert N. Lane (argued); Department of Fish, Wildlife and Parks;
Helena, Montana (State)

         Jack R. Tuholske (argued), Sarah K. McMillan (argued); Tuholske
Law Office, P.C.; Missoula Montana (Bitterroot River Protective
Association, Inc.)

     For Appellees:

         John E. Bloomquist; Doney, Crowley, Bloomquist & Uda, P.C.;
Helena, Montana (Intervenors Babcock, et al. and Lewis, et al. and
Montana Farm Bureau Federation)

         George H. Corn, Ravalli County Attorney; Hamilton, Montana
(Ravalli County Commissioners)

         Donald D. MacIntyre (argued), Attorney at Law; Helena, Montana;
(Bitterroot Conservation District)

         John S. Warren (argued); Davis, Warren & Hritsco; Dillon, Montana;
Ronald F. Waterman (argued); Gough, Shanahan, Johnson & Waterman;
Helena, Montana (Intervenors Babcock , et al. and Lewis, et al.)

     For Amici Curiae:

         Matthew Clifford, Attorney at Law; Missoula, Montana (Trout Unlimited)

         Elizabeth A. Brennan, Attorney at Law; Missoula, Montana (Sportsmen's
Groups)

         Page Dringman; Dringman & Redmon, P.C.; Big Timber, Montana
(Stockgrowers, Water Resources)


Argued and Submitted: October 10, 2007

Decided: November 17, 2008

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Appellant Bitterroot River Protective Association ("BRPA") appeals the January 12, 2006 Opinion and Order of the Twenty-first Judicial District Court, Ravalli County, affirming the determination of the Board of Supervisors of the Bitterroot Conservation District ("BCD" or "Board") that the Mitchell Slough, a body of water in the Bitterroot Valley, is not a "natural, perennial-flowing stream" under the Natural Streambed and Land Preservation Act of 1975, commonly known as the "310 Law" after its original legislative designation as Senate Bill 310. The BRPA, along with the Montana Department of Fish, Wildlife and Parks ("FWP"), also appeals the District Court's May 10, 2006 Opinion and Order holding that the Mitchell Slough is not subject to Montana's statutes governing stream access for public recreational use, referred to by the District Court and commonly as the "Stream Access Law" or "SAL." We affirm in part and reverse in part.

¶2 As the above introduction notes, this appeal comprises two cases, the first applying the 310 Law and the second applying the SAL, to the Mitchell Slough. We address the following dispositive issues in these cases:

¶3 I. The 310 Law case:

 A. Did the District Court err in upholding the process used by the BCD in determining the Mitchell Slough's status under the 310 Law?

 B. Did the District Court err by upholding the BCD's declaratory ruling that the Mitchell Slough is not subject to the 310 Law?

3

¶4    II. The Stream Access Law case:

    A. Did the District Court err by adopting verbatim Appellee's Walter E. Babcock, et al. and the Montana Farm Bureau Federation's proposed findings of fact?

    B. Did the District Court err by requiring Appellants to prove by a "clear preponderance" that the Mitchell Slough is a natural water body, and in its application of that burden of proof?

    C. Did the District Court err by concluding the Mitchell Slough is not a "natural water body" for purposes of the SAL, and therefore not subject to public recreational access?

## PROCEDURAL BACKGROUND

¶5    In 1999, the BCD received a letter inquiring whether 310 Law permits were required for work done within the bed and banks of the Mitchell. The answer to this question necessitated a determination of whether the Mitchell was a "natural, perennial-flowing stream" under the 310 Law. The BCD unsuccessfully sought the intervention of the Department of Natural Resources and Conservation, the Department of Environmental Quality, or FWP to make this determination. Following these "three strikes," the BCD initiated its own process, publishing notices related thereto in the *Ravalli Republic* in December of 2000 and January of 2001.

¶6    On January 24, 2001, the BRPA petitioned the District Court for an alternate writ of prohibition to stop the BCD from determining whether the Mitchell Slough was subject to the 310 Law, asserting that the BCD did not have jurisdiction to do so. The District Court denied the BRPA's petition for writ, and thereafter the BRPA sought a writ of prohibition from this Court. We denied that request in *Bitterroot River Protection*

4

*Association v. Bitterroot Conservation District*, 2002 MT 66, 309 Mont. 207, 45 P.3d 24 (hereinafter "*BRPA I*"). The BCD then continued its administrative declaratory ruling process, leading to the determination that the Mitchell is not a "natural perennial-flowing stream" and thus not subject to the 310 Law.

¶7 In November 2003, the BRPA sought declaratory relief and judicial review of the BCD's decision in the Twenty First Judicial District Court, Ravalli County, Hon. Ted L. Mizner, presiding. In its First Amended Complaint, the BRPA alleged four counts. Count I challenged the process employed by the BCD, Count II challenged the BCD's decision on the evidence and as an abuse of discretion, and Count III alleged that the BCD's 310 Law decision violated the Public Trust Doctrine. Count III was dismissed prior to trial and is not at issue on appeal. Based upon the administrative record and the parties' motions for summary judgment, the District Court entered an order on Counts I and II on January 12, 2006, affirming the BCD's 310 Law determination.

¶8 Count IV claimed that the waters of the Mitchell were open to recreational access under the SAL. A five-day bench trial was conducted in July 2005 on the stream access issue, and on May 10, 2006, the District Court filed an order holding that the Mitchell Slough was not subject to public access.

¶9 The posture of the parties and the issues in which they are participants are complex. The BCD is a party to the 310 Law issue only, by virtue of the appeal of its administrative decision. A group of individuals and ranch owners along the Mitchell Slough, Walter R. Babcock, Bitterroot Springs Ranch, John and Kathy Lewis, et al.,

5

intervened in the action, cross-claiming for a declaration that the Mitchell was not subject to the SAL. Landowner Marnell Corrao Associates, Inc., likewise intervened, contesting the status of the segment of the Mitchell passing through its property. The three primary irrigations companies, Etna Ditch, Webfoot Ditch and Union Ditch, and the Montana Farm Bureau likewise intervened. The Intervenors, along with the aforementioned landowners, about 25 in total, will be collectively referred to herein as the "Landowners." Landowners supported the decision of the BCD. The BRPA moved for joinder of FWP, who was a party in the proceeding before the BCD but did not appeal, as an "involuntary plaintiff" pursuant to M. R. Civ. P. 19(a). Given its failure to appeal from the BCD's decision, joinder of FWP was denied for the 310 Law case, but was granted for the SAL case. Certain of the Landowners filed a third-party complaint against Ravalli County alleging that the Mitchell Slough was not under the jurisdiction of the SAL, seeking to enjoin issuance of further portage permits on the Mitchell. After the parties stipulated to a stay of the County's intended portage hearings, it does not appear that the County further participated in the matter. Before this Court, Montana Trout Unlimited ("MTU") has filed an amicus brief supporting the BRPA's position on the 310 Law issue. Thirteen outdoor recreation organizations (collectively "Sportsmen's Groups") have filed a joint amicus brief supporting Appellants' positions on the stream access issue. Four stockgrower and resource organizations (collectively "Stockgrowers") have filed an amicus brief supporting Appellees' position on the stream access issue.

¶10    The BRPA appealed the District Court's decision upholding the BCD's 310 Law determination.  The BRPA and FWP appeal the District Court's decision regarding stream access on the Mitchell Slough.

## FACTUAL BACKGROUND

¶11    Two factual records were originally developed, one before the BCD for the 310 Law case, and the other before the District Court in the trial of the SAL case.  The factual recitation here is drawn generally from both records, and more specific facts are referenced in the respective discussions under each case.

¶12    The Mitchell Slough is located in Ravalli County, Montana, east of the Bitterroot River between Hamilton and Stevensville.  Tucker Headgate directs water from the East Fork of the Bitterroot River into the Mitchell.  The water travels through and across private property in a north/northeasterly direction, covering a linear distance of approximately ten miles before rejoining the Bitterroot River.  The Mitchell Slough itself meanders along a pathway approximately 16 miles in length.  The Mitchell splits into its own east and west channels, which both flow northerly in a parallel fashion and empty into the Bitterroot River.  Ditch companies and private water users have historically used water from the Mitchell Slough for irrigation, stockwater, and fish and wildlife purposes, and have routinely taken actions upstream of Tucker Headgate to ensure an even supply of water into the East Fork of the Bitterroot River, thereby also ensuring the consistent flow of water for diversion by the Tucker Headgate into the Mitchell.  This activity has

7

been ongoing for decades, for most of a century. Approximately 4,300 acres are irrigated from the Mitchell's flow every season.

¶13 The point of diversion for water moving from the East Fork into the Mitchell Slough used to be a quarter-mile downstream from its present location. In 1915, the three primary ditch companies using water from the Mitchell Slough constructed a concrete diversion structure in the East Fork to direct a dependable supply of water into the Mitchell. However, in the mid-twentieth century, the ditch companies constructed Tucker Headgate upstream from the natural entry into the Mitchell Slough and dug a quarter-mile canal to create a new connection from the East Fork to the Mitchell's channel via Tucker Headgate. The BCD found that, after surface water is diverted through this canal, it "ultimately flows into a historic natural channel" known as the Mitchell.

¶14 Rivers and streams throughout Montana have been manipulated for centuries, and the Bitterroot River and Mitchell Slough are no exception. Bruce Anderson, Landowners' expert hydrologist, testified that many Montana rivers have been channelized and riprapped, and have had weirs and diversion structures placed in them, for years. Anderson testified that the surface waters and groundwater in the Bitterroot Valley had been significantly altered by humans in many places. Likewise, the BCD relied on the expert report of Water Consulting, Inc., which noted that tributaries formerly drained from the Sapphire Mountains into the Bitterroot River floodplain but have been permanently severed and intercepted for irrigation purposes and no longer

8

reach the Bitterroot River. Water is now impounded at Painted Rock Reservoir and released as necessary into the Bitterroot.

¶15 Similarly, throughout the length of the Mitchell, residents have reconstructed the bed and banks of the watercourse, narrowed its channel, increased water velocities, and improved aesthetics and the fish and wildlife habitats. Certain portions of the Mitchell Slough have been rerouted, redirected, and controlled by humans to the extent that the Mitchell Slough does not follow the same path it may otherwise have naturally followed without intervention. The Mitchell has also been unnaturally elevated and bermed to access certain terraces lying to the east of the Bitterroot River. Periodic maintenance is required at Tucker Headgate and in certain locations within the Mitchell to clean sediment and gravel plugs from the watercourse. Nonetheless, though the extent is disputed, the Mitchell remains in partially the same location as in 1872, when the Government Land Office (GLO) Survey Map designated the Mitchell as the "Right Fork of the St. Mary's Fork of the Bitterroot River."

¶16 One major source of contention between the parties centers on the water flowing through the Mitchell which enters, not from Tucker Headgate, but from flows, drains and ditches that discharge water into the Mitchell at various points along its path. The amount of water entering the Mitchell at Tucker Headgate is less than the amount of water exiting at its confluence with the Bitterroot River, despite the fact that the Mitchell serves multiple diversions, including the Union, Etna, and Webfoot irrigation ditches. Discharges of irrigation wastewater and return flows from waters diverted upstream on

the Bitterroot River enhance the flow of the Mitchell. The District Court found that "[t]hese flows [into the Mitchell] would not exist but for the activity of humans to 'import' the water into the Mitchell drainage area." These irrigation wastewater and return flows contribute to the Mitchell Slough year-round. Even in February and March, when no irrigation is taking place, the amount of water flowing out of the Mitchell into the Bitterroot River is approximately double the amount flowing into the Mitchell Slough from the Bitterroot River at Tucker Headgate.

¶17 The BCD concluded that the Mitchell Slough is "partly man-made and partly within an historic channel of the Bitterroot River." The BCD also concluded that there is "significant ground water in the area of the Mitchell," and "some of the water in the Mitchell results from ground water, the likely source of which is diverted or irrigation water." Additionally, the BCD concluded that "the Mitchell flows are mainly from water directly diverted to it at the Tucker Headgate or indirectly diverted to it from man-made drainage ditches, although it would likely flow at some level and some places in the absence of the above-mentioned diversions." Both the BCD and the District Court concluded that without the current diversion of water into the East Fork of the Bitterroot River and then into the Mitchell Slough by Tucker Headgate, and without the water contributions from irrigation wastewater and return flows, the Mitchell Slough would not sustain a natural, perennial flow. The Mitchell has never run dry, and 310 Law permits have previously been issued on the Mitchell.

10

**STANDARDS OF REVIEW**

¶18 We review agency declaratory rulings "in the same manner as decisions or orders in contested cases" under the Montana Administrative Procedures Act (MAPA). Section 2-4-501, MCA; *accord* § 2-3-113, MCA; *BRPA I*, ¶ 18. This applies to the BCD's declaratory ruling on the applicability of the 310 Law. Thus, our review is guided by the standards of review set forth in § 2-4-704, MCA. "When reviewing an agency decision, a district court may not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact." *Ray v. Montana Tech of the U. of Mont.*, 2007 MT 21, ¶ 24, 335 Mont. 367, ¶ 24, 152 P.3d 122, ¶ 24 (citing § 2-4-704(2), MCA). Instead, the district court reviews an agency's decision to determine if the agency's findings of fact were clearly erroneous and whether its conclusions of law were correct. *Ray*, ¶ 24. We apply the same standard to our review of a district court's decision to affirm an agency decision. *Ray*, ¶ 24. In reviewing conclusions of law under § 2-4-704, MCA, we determine whether the agency's interpretation of the law is correct. *Steer, Inc. v. Dept. of Revenue*, 245 Mont. 470, 474, 803 P.2d 601, 603 (1990). The BCD argues that its decisions are entitled to deference. However, while long-standing statutory interpretations by agencies are entitled to "respectful consideration," *Montana Power Co. v. Montana Public Service Commission*, 2001 MT 102, ¶ 25, 305 Mont. 260, ¶ 25, 26 P.3d 91, ¶ 25, and we have acknowledged the value of the BCD's expertise in the review of 310 determinations, *BPRA I*, ¶ 19, "no discretion is involved when a tribunal arrives at a conclusion of law—the tribunal either correctly or incorrectly applies the law." *Steer*,

11

245 Mont. at 474, 803 P.2d at 603. With regard to the SAL case, we apply the same standards with regard to findings of fact and conclusions of law entered by the district court following trial, reviewing the findings for clear error and the conclusions for correctness.

## DISCUSSION

### I. The 310 Law case

¶19   **A.   Did the District Court err in upholding the process the BCD used in determining the Mitchell Slough's status under the 310 Law?**

¶20   The BRPA argues that the process the BCD used in rendering its 310 Law determination regarding the Mitchell was inadequate, especially because constitutional rights involving natural resources were implicated in the matter. The BCD responds that it was not required to comply with any particular process or procedure, such as a MAPA contested case proceeding, and that it complied with constitutional mandates by affording the public, including the BRPA, a reasonable opportunity to participate prior to making its decision.

¶21   Article II, Section 8, of the Montana Constitution provides that "[t]he public has the right to expect governmental agencies to afford such reasonable opportunity for citizen participation in the operation of the agencies prior to the final decision as may be provided by law." Section 2-3-101, MCA, referencing "the mandate of Article II, section 8," provides that citizens are to be "afforded reasonable opportunity to participate . . . ." Section 2-3-111(1), MCA, provides that "[p]rocedures for assisting public participation must include a method of affording interested persons reasonable opportunity to submit

12

data, views, or arguments, orally or in written form, prior to making a final decision that is of significant interest to the public." The essential elements of public participation are notice and an opportunity to be heard. Section 2-3-103(1)(a), MCA.

¶22 The BRPA does not argue that it was provided inadequate notice in this matter. Rather, the BRPA argues that after the BCD began an informal information-gathering process, it "switched to an adversarial hearing" and announced that MAPA procedures would be used and would require the BRPA to hire an attorney. After this announcement was made, the BRPA argues, the BCD failed to employ MAPA procedures because "[d]iscovery, production of documents or entry upon land wasn't allowed" and the parties could not subpoena witnesses. The BCD also restricted the BRPA's ability to cross-examine one of Landowners' experts, Barry Dutton, who submitted a report but did not appear. Thus, the BRPA argues that the BCD "contradicted its own rules" by employing MAPA-like procedures in some ways, but not others.

¶23 The BCD responds that the proceeding was "a unique, but nonetheless reasonable, method to gather information to make its declaratory ruling." BCD argues that no particular procedure was required, as in a MAPA contested case proceeding, because the proceeding was intended for the sole purpose of gathering information for its decision. According to the BCD, it "undertook a non-contested case declaratory ruling" as authorized by this Court in *BRPA I* which strictly adhered to the mandate of Article II, Section 8 by providing a reasonable opportunity to participate. The BCD explains that it proceeded under Montana's public participation statutes and its own rules in conducting a

13

public hearing. BCD Rule 6(2) provides that "[i]f questions arise, about the accuracy of the perennial stream designation of these maps, the district may use water rights records, stream flow and hydrologice [sic] data and interviews with area residents and professionals. The district may also conduct a public hearing to gather information." Under BCD Rule 18(4), the BCD may hold a public hearing "when the supervisor determines a proposed project to be controversial,[1] or where additional information is desired prior to final action by the supervisors." Acknowledging that the process took on certain attributes of a MAPA proceeding, the BCD nonetheless argues that nothing more was required, and it was free to formulate a process that fit the demands of the task before it.

¶24 The BCD initiated the declaratory ruling process by holding an open public meeting. Individuals were allowed to provide oral and written statements, and interested persons were granted an additional seven days to submit further information. The BCD then suspended its decisionmaking process when the BRPA filed a petition for writ of prohibition challenging the BCD's authority, the litigation which led to our decision in *BRPA I*. Following that decision, the BCD allowed another sixty days for the submission of additional written information, and provided that any party adverse to someone presenting information would be afforded an opportunity for cross-examination. A cross-examination hearing was thereafter conducted. During the process, the BCD received 1,528 pages of information, in addition to oral statements. The Board's members each

---

[1] There would seem to be little doubt that this matter would be properly classified as "controversial."

spent approximately 550 hours discussing and reviewing the information prior to issuing a declaratory ruling.

¶25 The BCD correctly notes that it was not required to hold a contested case proceeding under MAPA, because it is exempted from MAPA as a political subdivision of the State. *See* § 2-4-102(2)(b), MCA. As we have held, conservation districts can initiate 310 Law determinations through the use of non-MAPA declaratory rulings. *BRPA I*, ¶ 22. We see no reason why the BCD could not use certain procedures similar to those in a MAPA contested case proceeding, if fairly employed, without being obligated to implement all of MAPA's requirements, as the BRPA essentially contends. The BCD did not have the ability to subpoena witnesses, but it provided an opportunity to cross-examine presenters. Although the BRPA argues it was unable to cross-examine every witness it desired, this limitation cannot be faulted within the more informal declaratory process used here and, although the BCD's decision referenced the withdrawn Dutton Report without granting an opportunity for cross-examination of the author, we agree with the District Court that any error this may have constituted was harmless, given the cumulative nature of other evidence.

¶26 The BCD did appear to stutter-step in communicating its intentions about how it would conduct the statutory process we characterized in *BPRA I* as offering "no clear guidance." *BPRA I*, ¶ 16. However, in a case which was both complicated and controversial, the BCD, four members of which are locally elected, *BRPA I*, ¶15, n. 1, complied with its own rules, gave notice and provided an extended opportunity to submit

15

information, permitting the BRPA and other interested persons to submit voluminous materials, offer oral opinions and statements, make objections and provide written arguments prior to the rendering of a final decision. James Haynes, now a district court judge, was appointed "Hearing Facilitator" by the BCD and did a commendable job presiding over the hearings. We conclude that the BCD's "method of affording" public participation, § 2-3-111(1), MCA, was fundamentally fair and provided a "reasonable opportunity for citizen participation" as required by Article II, Section 8 of the Montana Constitution, and we affirm the District Court in upholding the process.

¶27 **B. Did the District Court err by upholding the BCD's declaratory ruling that the Mitchell Slough is not subject to the 310 Law?**

¶28 The 310 Law is one of "a comprehensive set of laws" enacted by the Legislature to "accomplish the goals of the constitution," including Article IX, section 1, which requires legislative provision of remedies to prevent "depletion and degradation of natural resources." Preamble, Ch. 361, L. 2003.[2] Under the 310 Law, enacted in 1975, Montana's "natural rivers and streams and the lands and property immediately adjacent to them" are to be "protected and preserved to be available in their natural or existing state." Section 75-7-102(2), MCA. To fulfill this purpose, the 310 Law requires any person planning a physical alteration or modification of a stream to obtain approval from the conservation district before initiating the proposed project.

---

[2] The parties do not address which year's version of either the 310 Law or the SAL is applicable. However, no amendments to any of the provisions of either Act discussed herein have been made since the initiation of this litigation.

16

¶29 At issue is whether the Mitchell Slough is a "stream" that falls within the regulatory provisions of the 310 Law. A "stream" is defined by the 310 Law as a "natural, perennial-flowing stream or river, its bed, and its immediate banks . . . ." Section 75-7-103(6), MCA. The phrase "natural, perennial-flowing stream" is not further defined in the 310 Law. A regulation promulgated by the Department of Natural Resources and Conservation (DNRC) defines the term as "a stream which in the absence of diversion, impoundment, appropriation, or extreme drought flows continuously at all seasons of the year and during dry as well as wet years." Admin. R. M. 36.2.402(7).[3]

¶30 In its declaratory ruling, the BCD concluded that the Mitchell is not a natural, perennial-flowing stream, and thus, is not subject to the requirements of the 310 Law. In affirming this decision, the District Court started with the proposition that "natural" means something which exists in nature and is "not artificial," and thus reasoned that, when read in their entirety, "the law and the administrative regulation intended the term 'natural' to mean in the absence of any man-made manipulation . . . ." From this interpretation, the District Court concluded that water diverted into the Mitchell is "unnatural, appropriated water and must be excluded when determining whether or not the Mitchell is a natural, perennial-flowing stream." (Emphasis omitted.)

---

[3] The bill creating the Natural Streambed and Land Preservation Act, or 310 Law, directed the DNRC to "adopt rules setting minimum standards and guidelines for purposes of this act." Section 11, Ch. 463, L. 1975. Initially codified as § 26-1520, R.C.M., this provision was not re-codified in the MCA. *See* Compiler's Comments, § 75-7-101, et seq., MCA.

¶31     On the premise that the Mitchell was thus not a natural stream and did not run in a primarily natural channel, the District Court also reasoned that the rule of *Hidden Hollow* did not bring irrigation return flows into the calculus of the Mitchell's status. *Hidden Hollow Ranch v. Fields*, 2004 MT 153, 321 Mont. 505, 92 P.3d 1185. In *Hidden Hollow*, we held that "[w]here . . . vagrant, fugitive waters have finally collected and reached a natural channel . . . [such as] water of a slough fed by seepage from irrigation, the waters flowing in such natural channel constitute a watercourse within the meaning of the law of water rights." *Hidden Hollow*, ¶ 31 (quoting *Popham v. Holloron*, 84 Mont. 442, 451, 275 P. 1099, 1103 (1929)). Though acknowledging that the Mitchell flowed "in parts of its natural channel," the District Court observed that, due to "man-made alterations such as headgates, lifts, drops[,] . . . channel excavations[,] and renovations necessary to lift water from the Bitterroot River," which had migrated over the years to the west, parts of the Mitchell Slough no longer flowed in its natural channel. It concluded the *Hidden Hollow* rule would apply only "[w]hen the returns flows from this diverted water hit the Bitterroot River, a natural stream." Accordingly, the District Court concluded that the Mitchell Slough is not a natural, perennial-flowing stream for purposes of the 310 Law.

¶32     The critical terms within the statutory definition of "stream" are "natural" and "perennially-flowing." Regarding the latter term, there appears to be no dispute that the Mitchell flows continuously throughout the year, both during and outside of irrigation season. The BRPA notes that there was no evidence indicating the Mitchell had ever run dry. The BCD found that significant groundwater was present in the area and that

18

"[s]urface inflows and outflows on the Mitchell system do not account for all water flowing in the waterway." It found that between 10 and 16 cubic feet per second of groundwater flowed in the Mitchell, and that there was an increase in the Mitchell's flow between the diversion at Tucker Headgate and its discharge into the Bitterroot River at Bell's Crossing. However, the District Court turned to the term "natural," concluding that the Mitchell's perennial flow was sustained only by the "unnatural" additions discussed above. It compared the 123,000 acre feet of water "diverted into the Mitchell" with 700 acre feet of "natural flow" and noted testimony which predicted that the Mitchell would become "a well-vegetated swale and series of disconnected wetlands" but for the Tucker diversion and return flows, a conclusion it reasoned was supported by the evidence that the Mitchell's hydrology, slope and channel geometry was inconsistent with a typical rain and snowmelt dominated stream.[4]

¶33     The technical and scientific evidence entered upon the record with regard to the nature and status of the Mitchell Slough is comprehensive and compelling. Detailed professional studies have been completed. One of the studies explains the standards applied in assessing the Mitchell's status:

---

[4] The District Court was apparently referring to a report estimating that 123,375 acre feet of water was imported per year into the entire "Mitchell Catchment," in which the Mitchell Slough is but one water body. Of that total, the Slough itself conducts an estimated 40,420 acre feet of irrigation water. The same report estimated that the average natural flow from precipitation within the entire Catchment was 7,627 acre feet per year. *See The Mitchell Ditch, A Geomorphic and Hydrologic Analysis of its Historic and Current Condition*, January 2001, Water Consulting, Inc. at 11-12. The BCD found that 10%, or "approximately 700 acre-feet per year," were added to the Mitchell Slough by precipitation.

The primary purpose of the assessment presented in this report is to render an opinion, based upon available information, of the degree to which the Mitchell Ditch is a "natural perennial-flowing stream."

. . .

. . . We assessed this question by applying criteria that are now being used on an international front as a guide for sustainable management of waterways (PIANC, 2002), and are being tested and evaluated for use in the US Army Corps of Engineers' Section 404 determinations (Fischenich, 2002). These criteria relate to assessing the natural functions of stream and riparian ecosystems, and were formulated by a panel of international experts in hydrology, biology, ecology, geomorphology, water resource management, and related fields. The US Army Corps of Engineers, US Environmental Protection Agency, and the US Forest Service were active participants in their formulation.

The approach of this study was to "describe the stream and riparian ecosystem functions deemed important by this body of experts, and to the extent to which the functions are met on the Mitchell Ditch." Applying these standards, the report concluded: "Our assessment of the functional characteristics of the Mitchell Ditch suggest that, while the ditch and its riparian corridor provide significant biological attributes, they lack the system dynamics and hydrodynamic conditions that sustain those attributes and that characterize natural systems. Despite appearances, the Mitchell Ditch is a highly artificial system that required construction to attain its current form. . . . [C]essation of the management activities would result in the rapid degradation of many of the functions, conversion to a lotic system, and the eventual loss of most aquatic features and characteristics."[5]

---

[5] All quotations in this paragraph are from *Evaluation of the Mitchell Ditch*, June 2002, J. Craig Fischenich, Ph.D., P.E., FIScH Engineering, pp. iii, 3, 22, 23.

¶34 The evidence in the record is substantial and clearly supports the BCD's findings of fact. Like the District Court, we do not generally disagree with the Board's factfinding. Our concern, however, is with the application of our state's legal principles to this dispute. We have few, yet important, constitutional, statutory, and regulatory provisions to guide the consideration of the question, none of which either expressly incorporates or rejects the highly technical approaches used by the studies to assess the Mitchell's natural status. While we certainly do not eschew the use of scientific evidence and models, neither can we permit such approaches to impose technical definitions of "natural" or other terms which would be inconsistent with our State's legal principles. The District Court wrestled with this, ultimately adopting a narrow, perhaps "scientific" definition of "natural." It reasoned that "the law and administrative regulation intended the term 'natural' to mean *in the absence of any man-made manipulation . . .*" (emphasis added), and concluded that the water in the Mitchell was overwhelmingly "unnatural." For reasons explained below, we believe the definition adopted by the District Court, and the conclusions premised thereon, are errors of law.

¶35 There would be little disagreement with the proposition that virtually all of Montana's waters have been altered or manipulated by man. The evidence in this case demonstrates that the primary source water for the Mitchell, the Bitterroot River, is no exception. The western migration of the Bitterroot noted by the District Court has necessitated extensive manipulations by man in order to keep water flowing into the

21

Bitterroot's East Fork, from which the Tucker Headgate diverts water into the Mitchell, and has done so for one hundred years:

> Flow must be redirected at times of the year from the West Channel into the East Channel of the Bitterroot River . . . The very existence of the East Channel has recently been dependent upon the actions of the ditch companies who are required to regrade and berm channel deposits in order to convey flow to the East Channel. Without the East Channel, Mitchell Ditch would not receive surface water flow, directly from the Bitterroot River.

*Summary of Opinions, Mitchell Ditch*, May 2005, Michael E. Nicklin, Ph.D., P.E., Nicklin Earth & Water, Inc., p. 3.

> As a result of man's activities, numerous structures can be seen on all the different years of aerial photography that were analyzed.
>
> . . .
>
> These structures indicate that large-scale early efforts were required by people to prevent westward migration of the Bitterroot in order to capture its water and move it east and northward.
>
> . . .
>
> . . . These photos, maps and articles serve as examples of the literally hundreds of efforts to artificially move, remove, fix, dry up, divert, store, elevate, fill or manipulate surface water flow in the Bitterroot River and Mitchell Ditch system over the last 100 years.

*Summary of Opinions, Mitchell Ditch*, June 2005, Laurel Collins, Watershed Sciences, pp. 15, 19.

¶36 The evidence demonstrates that *even the Bitterroot River* has been subjected to substantial manipulation by man for many years in order to maintain its flow in the current location. Although the District Court's determination that the Bitterroot is a

22

"natural stream" would not be disputed, it is also clear that the East Fork of the Bitterroot would not sustain a flow in its present location "in the absence of man-made manipulation." Of course, in the absence of manipulation, the Bitterroot would flow elsewhere, but this point serves only to demonstrate the problem with employing a strictly technical definition of the term "natural": even the water diverted at Tucker Headgate is not entirely "natural." Thus, the District Court's definition of the term, as definitive and convenient as it may be, is unworkably narrow.

¶37 When passing the 310 Law, the Legislature recognized man's impact, both past and future, upon the State's waters, requiring that rivers and streams "are to be protected and preserved to be available in their *natural, or existing state,* and to prohibit unauthorized projects . . . ." Section 2, Chap. 463, L. 1975 (emphasis added). The bill's title stated it was for "An Act to provide for a policy of preserving the *natural or existing shape, form and course* of streams to activities of private persons or organizations . . ." (emphasis added). The 310 Law thus contemplated protection of the "existing shape, form and course" of waters, even if those waters were no longer purely "natural." The "existing" state of affairs when the 310 Law was passed in 1975 was that the East Fork of the Bitterroot had already been heavily manipulated in order to convey water to Tucker Headgate, which was then diverting water into the quarter-mile dug channel leading to the Mitchell Slough. Looking ahead to future impacts, the 310 Law required stream "projects"—physical alterations or modifications—to be pre-authorized by a conservation district. Section 75-7-103(5) -111, -112, MCA. The Tucker Headgate is precisely the

23

kind of stream alteration which would be subject to review and approval under the 310 Law.

¶38     The DNRC's regulation, promulgated in an effort to provide a workable definition of a "natural, perennial-flowing stream" to be protected by the 310 Law, defines the term as "a stream which in the absence of diversion, impoundment, appropriation, or extreme drought flows continuously at all seasons of the year and during dry as well as wet years." Admin. R. M. 36.2.402(7). The parties argue over whether the term "absence of diversion" requires exclusion of water diverted only "out of" a stream, as argued by BRPA, or also water "into" a stream, as argued by BCD and applied by the District Court, in determining a stream's status under the 310 Law. BRPA also argues that the term "absence of diversion" is ambiguous, given these possible interpretations, and urges us to consider the rule's legislative history. That history supports BRPA's interpretation, as does the plain language of the terms listed in the rule. "Diversion," "impoundment," "appropriation," and "extreme drought," when viewed together, all contemplate water being taken "out" of a stream, not being added to a stream.

¶39     However, though helpful, it is clear that this regulation does not contemplate all of the circumstances presented in this case. The rule's definition of "natural, perennial-flowing stream" assumes the existence of a natural stream: "'[a] natural, perennial-flowing stream' means a stream . . . ." It provides protection for the stream which runs dry, if the stream would otherwise flow continuously without diversions, impoundments, appropriations and droughts. *See also* Admin. R. M. 36.2.407 ("A [conservation] district

24

may consider a stream to flow perennially if it dries up periodically due to man-made causes, or extreme drought."). The rule does not provide guidance on the question of whether a natural stream exists in the first instance.

¶40    Given the state of the law, we see no other way to determine whether the Mitchell Slough is a "natural, perennial-flowing stream or river" other than by considering the totality of the circumstances demonstrated by the factual record. In view of man's pervasive impact upon the State's waters, and the 310 Law's originally stated purpose to protect streams in their "natural or existing" state in order to implement the constitutional directive to prevent the "depletion and degradation of natural resources," the nature and extent of man's impact must also be a consideration in this determination. The question is necessarily more complicated than simply asking whether man has or has not manipulated the water and its channel. With this in mind, we turn to the factual record.

¶41    Evidence of the Mitchell's history includes a General Land Office surveying map prepared in 1872, prior to statehood, which indicated area water courses. Although noting that the Mitchell does not correspond precisely with the courses noted thereon, the BCD found that several sections of the Mitchell's channel are co-extensive with the slough depicted on the 1872 GLO map. The BCD found that the Mitchell has been "manipulated, moved and straightened" since 1872, but that surface waters flowing into the Mitchell through the manmade channel at Tucker Headgate "ultimately flow into a historic natural channel." The BCD concluded from these findings that the Mitchell "is partly man-made and partly within a historic channel."

25

¶42     Despite these findings regarding the Mitchell's channel, the BCD now argues that the term "natural" should apply only to "flow" and should not "be defined in terms of the character of the channel." The BCD reasons that "a gully, an ephemeral stream, and an intermittent stream all exist in natural channels. The fact that the channels are natural says nothing about the character of the flow." However, we disagree. The 310 Law's definition of "stream" includes "any natural, perennial-flowing stream or river, *its bed, and its immediate banks . . . ,*" § 75-7-103(6), MCA (emphasis added), and the Law's statement of intent refers to preservation of "natural rivers and streams *and the lands and property immediately adjacent to them.*" Section 75-7-102(2), MCA (emphasis added). While the stream's flow is obviously critical, the nature of the channel is nonetheless a relevant consideration. Although man has made many alterations, the Mitchell is acknowledged to flow in a significantly historic, natural channel, parts of which date back over 100 years.

¶43     This conclusion undermines the District Court's determination that return irrigation flows cannot be included in the calculus of the Mitchell's status under *Hidden Hollow* because such flows do not return to a "*natural* channel" (emphasis by District Court). The District Court acknowledged that its exclusion of return flows rested on the presupposition that the Mitchell was not a natural watercourse but, of course, that is the ultimate issue of this litigation, and the facts must be considered before a conclusion of law can be reached. Given the Mitchell's significantly historic, natural channel and the return of irrigation waters to the Mitchell's flow, wherein such fugitive waters collect and

26

"lose their original character as seepage," such as "water of a slough fed by seepage from irrigation," and become part of the watercourse, these waters are subject to further appropriation and are properly considered in determining the Mitchell's status. *Hidden Hollow*, ¶ 31. As noted, the BCD found that the Mitchell's flow increases along its course, and one reason for that is the return of irrigation waters from the entire Mitchell Catchment, some of which are originally diverted at Tucker Headgate, and some of which are diverted elsewhere. The Mitchell thus serves as a conduit to collect and carry these vagrant waters, from various point sources, to their reunification with the Bitterroot River at Bell's Crossing. These return flows join the Mitchell's natural waters, fed by groundwater springs and precipitation, and flow together.[6]

¶44 The first feature which stands out about the Tucker Headgate is the magnitude of water it diverts from the Bitterroot River. The District Court described the diversion as a "huge volume of water." Although the total amount of water diverted annually at Tucker Headgate is not a matter of record, it is estimated that the water diverted from the

---

[6] The BCD found that natural springs and precipitation contribute to the Mitchell's flow, and these are joined by groundwater and return flows. A significant portion of the groundwater in the Mitchell Slough has been attributed to return flows from other irrigation sources, although the precise amounts have not been determined. However, all of these waters, when joining a stream, are unappropriated. While we understand, as Appellees point out, that this is not an appropriative rights case, the legal status of return waters for appropriative purposes provides an apt analogy in determining the Mitchell's status. Further, similar to the District Court's, the Landowners' rationale against consideration of the appropriative status of return flows is premised, in part, on the assumption that the Mitchell is merely a drain ditch which conveys water away from the point of irrigation. As noted herein, our conclusion is that the Mitchell serves greater purposes than merely a conduit to drain the fields which are irrigated by its waters.

27

Mitchell Slough for irrigation purposes exceeds 40,000 acre-feet,[7] or enough water to cover 40,000 acres with a foot of water. Of course, the Tucker Headgate diverts a large volume of water primarily to serve the appropriative rights of area irrigators, and rightfully so. As the 310 Law states, "it is the policy of this state to recognize the needs of irrigation and agricultural use of the rivers and streams of the state of Montana," Section 75-7-102(2), MCA, and the Tucker Headgate diversion provides for these uses.

¶45 In consideration of this primary use, the District Court concluded that "[w]ater diverted into the Mitchell is unnatural, appropriated water and must be excluded" from consideration of the Mitchell's status. (Emphasis omitted.) However, it is very clear from the record that the large volume of water diverted at Tucker Headgate is not exclusively dedicated to appropriative rights. Although the District Court noted that the weight to be assigned to the "vibrant" fishery evidence was in the BCD's discretion, there is no dispute that such fisheries exist and habitat has been developed along the Mitchell, as the BCD found. The fisheries are supported by a perennial flow, whether in or out of irrigation season. The flow increases along its path and deposits more water back into the Bitterroot River than diverted from the Bitterroot at Tucker Headgate. The fishery development along the Mitchell is made possible by deployment of a state natural resource—waters diverted from Tucker Headgate not consumed by appropriative rights, as well as return flows, groundwater, springs and precipitation. The 310 Law is intended to "protect the use of water for any useful or beneficial purpose as guaranteed by The

[7] *The Mitchell Ditch, A Geomorphic and Hydrologic Analysis of its Historic and Current Condition*, January 2001, Water Consulting, Inc., p.12.

Constitution of the State of Montana." Section 75-7-102(2), MCA. Further, the Law's purpose is to fulfill the constitutional directive to "prevent unreasonable depletion and degradation of natural resources." Section 75-7-102(1), MCA; Mont. Const. art. IX, § 1(3). To allow the volume of water flowing in the Mitchell which is not consumed by appropriative uses to simply cede from the jurisdiction of the Law designed to protect the state's waters would be to fail "to protect the use of water for any useful or beneficial purpose," and would be an "unreasonable depletion" of a state resource.

¶46 The District Court did a yeoman's job in wrestling with this issue. However, the conclusion that natural, perennial-flowing streams must have flows which have never been diverted, impounded, appropriated or otherwise manipulated by man was incorrect. That definition is unreasonably narrow as inconsistent with the 310 Law and the extensive, man-impacted condition of the state's waters. The Mitchell flows continuously through significant portions of a historic channel, includes flows from groundwater, springs, return flows and precipitation, and includes waters exceeding what are necessary to serve seasonal irrigation rights and other beneficial uses. Such excess waters are a state resource.

¶47 Thus, upon this record and upon a consideration of the totality of the circumstances, we conclude that the Mitchell Slough qualifies as a natural, perennial-

29

flowing stream under the 310 Law.  We thus reverse the judgment and remand for entry of a judgment in favor of BRPA.[8]

## II.  The Stream Access Law Case

¶48    As noted above, the BRPA and FWP are appealing from the stream access judgment.  Landowners are Appellees.  The BCD is not a party to the stream access issue, as that issue was raised by a declaratory action filed in the district court.  The stream access claim constituted Count IV of the First Amended Complaint and the Landowners' cross-claim and was tried before the District Court, sitting without a jury.  By order of May 10, 2006, the District Court entered judgment in favor of the Intervenors and Landowners that the Mitchell Slough was not subject to public recreational use under the Stream Access Law.  In addition to its own analysis and order, the District Court adopted by reference the extensive proposed findings of facts and conclusions of law submitted by the Intervenors/Landowners.  Those findings took judicial notice of the Declaratory Ruling issued by the BCD in the 310 Law case within n. 73.

¶49    Although the two primary issues in this appeal involve the status of the Mitchell Slough, they are not the same inquiry.  As we have explained, "the Streambed Preservation Act [310 Law] and the Stream Access Act each use two entirely different

---

[8] BRPA also raises the issue of whether a review of the whole record leaves the Court with an impression that a "definite and firm conviction that a mistake has been committed" by the District Court in reviewing the BCD's 310 Law determination and determining that the Mitchell Slough is not a natural, perennial-flowing stream.  An argument under this standard is an attack upon the BCD's findings of fact as clearly erroneous.  Our reversal of the District Court based upon incorrect conclusions of law alleviates the need to address this issue.

definitions for designating what bodies of water are covered under their respective provisions . . . Neither the [310 Law] nor the Stream Access Act states that if a body of water is not a stream under the [310 Law], it is necessarily a ditch under the Stream Access Act. Therefore, while the BCD's decision on the Mitchell Slough's status as a stream is potentially significant, the decision, regardless of its outcome, does not necessarily determine whether the Mitchell Slough is a ditch under the Stream Access Act. These are two separate factual inquiries." *BRPA I*, ¶ 21.

¶50 The arguments of the parties and amici regarding the application of the SAL do not venture far from the underlying constitutional rights which protect their respective interests. BRPA, FWP and Amici Sportmen's Groups focus on the declaration within Article IX, Section 3, that all waters within Montana are owned by the state for the use of its people. Landowners and Amici Stockgrowers emphasize that same provision's preservation of appropriative rights and cite the property right protections within Article II, Section 3, and Article IX, Section 7. Each party beckons us to view the case and decide it while looking through different constitutional lenses. This is not the first time the Court has experienced the constitutional tension which permeates this issue.

¶51 The 1972 Constitution contained a new provision—not part of the 1889 Constitution—which expressly addressed the state's ownership of all waters. Article IX, Section 3(3) states:

> All surface waters, underground, flood, and atmospheric waters within the
> boundaries of the state are the property of the state for the use of its people
> and are subject to appropriation for beneficial uses as provided by law.

31

Citing this provision, the Court, in *Montana Coalition for Stream Access, Inc. v. Curran*, held that "under the public trust doctrine and the 1972 Montana Constitution, any surface waters that are capable of recreational use may be so used by the public without regard to streambed ownership or navigability for nonrecreational purposes." 210 Mont. 38, 53, 682 P.2d 163, 171 (1984); *see also Mont. Coalition for Stream Access, Inc. v. Hildreth*, 211 Mont. 29, 35, 684 P.2d 1088, 1091 (1984). We added a "cautionary note that nothing herein contained in this opinion shall be construed as granting the public the right to enter upon or cross over private property to reach the State-owned waters hereby held available for recreational purposes." *Curran*, 210 Mont. at 55, 682 P.2d at 172; *Hildreth*, 211 Mont. at 36, 684 P.2d at 1091. In response to the *Curran* and *Hildreth* decisions, the 1985 Legislature enacted the SAL, an act "generally defining laws relating to recreational use of state waters," to codify and provide specifics with regard to recreational use of state waters. Ch. 556, L. 1985. The SAL was challenged on constitutional grounds by landowners in *Galt v. State*, 225 Mont. 142, 731 P.2d 912, (1987), and the constitutional protections referenced by the parties in this case were likewise argued by the parties in *Galt* to respectively challenge and defend the various provisions of the SAL. We stated that "[t]he real property interests of private landowners are important as are the public's property interest in water. Both are constitutionally protected. These competing interests, when in conflict, must be reconciled to the extent possible." *Galt*, 225 Mont. at 148, 731 P.2d at 916. The Court reconciled these constitutional rights by striking several

32

provision of the SAL as violative of private property rights, and by affirming the balance of the Act as constitutional.[9] *Galt*, 225 Mont. at 148-49, 731 P.2d at 916.

¶52　Although the parties' arguments are laced with constitutional language, we are not faced here, as in *Galt*, with a constitutional challenge to any of the provisions of the SAL. Rather, this case is primarily one of statutory interpretation, the application of the SAL to the factual record. We do our utmost, in undertaking this task, to act with respect for all of the constitutional rights of the parties, and with respect for this Court's previous efforts to balance the constitutional rights at issue.

¶53　**A. Did the District Court err by adopting Appellee's Walter E. Babcock, et al. and the Montana Farm Bureau Federation's proposed findings of fact verbatim?**

¶54　The BRPA argues that the District Court failed to exercise independent judgment by adopting Landowners' proposed SAL Findings of Fact and Conclusions of Law verbatim. According to the BRPA, the District Court's adopted Findings are clearly erroneous because they are not supported by substantial credible evidence. The BRPA argues that the adopted Findings contain imprecise citations to the record and are contradicted by the BCD's 310 Law decision.

¶55　"Although we have discouraged the practice of adopting verbatim the proposed findings and conclusions submitted by a party, we recognize that, once adopted, the findings become formally those of the district court judge, and are not to be overturned simply because the court relied upon proposed findings and conclusions submitted by

---

[9] One who reads the SAL may not realize that some of the Act's provisions are no longer valid. Certain of the Act's provisions struck by the Court 21 years ago in *Galt* remain in the Code.

counsel." *Rossi v. Pawiroredjo*, 2004 MT 39, ¶ 26, 320 Mont. 63, ¶ 26, 85 P.3d 776, ¶ 26 (citation omitted). "[A] court is not necessarily prohibited from adopting the prevailing party's proposed findings; the test is whether the findings are sufficiently comprehensive and pertinent to the issues to provide a basis for decision and whether they are supported by the evidence." *In re Marriage of Crilly*, 2005 MT 311, ¶ 38, 329 Mont. 479, ¶ 38, 124 P.3d 1151, ¶ 38 (citation omitted).

¶56 A review of the District Court's order and the Landowners' proposed findings and conclusions does not indicate error was committed merely by virtue of the court's verbatim adoption of the findings and conclusions. While there are instances in which Landowners' proposed findings do not entirely comport with the District Court's opinion, those discrepancies are minor. The District Court clearly performed its own analysis and drafted its own narrative order. Its further verbatim adoption of the Landowners' proposed findings and conclusions, which did not conflict with the court's narrative order in any significant way, was not error. Whether these conclusions were substantively correct is a separate issue, discussed hereinafter.

¶57 **B. Did the District Court err by requiring Appellants to prove by a "clear preponderance" that the Mitchell Slough is a natural water body, and in its application of that burden of proof?**

¶58 Noting the District Court's conclusion that BRPA did not prove by a preponderance of the evidence that the Mitchell was a natural water body, the BRPA argues that, because Landowners brought a cross-claim asking the District Court to declare the Mitchell Slough exempt from the SAL, the burden of proof should have been

on Landowners to prove that the Mitchell is *not* a natural water body in order to further protection of the state's resources. BRPA also argues that, because constitutional interests in accessing a public resource are at stake when a stream is declared exempt from recreational use under the SAL, and the public's use foreclosed, the District Court should have imposed a heightened burden of proof on Landowners in order to prevail on their claim. Instead of proof by preponderance of the evidence, BRPA, citing *Addington v. Texas*, 441 U.S. 418, 99 S. Ct. 1804 (1979), urges the Court to require a "clear, unequivocal and convincing" standard of proof in order to "de-list" a stream from SAL's application.

¶59 Landowners reply that the SAL protects many constitutional rights, including their right to protect private property and privacy, and that the District Court decided disputed issues of fact by properly applying a "clear preponderance of the evidence" standard to both sides. Appellee Marnell Corrao's brief notes that the Legislature has departed from the standard civil burden of proof for specific kinds of cases only rarely, and did not do so for the SAL, arguing that BRPA's request for a heightened standard "is a weak reed. Montana's noxious weed management trust fund enjoys constitutional status proximate to those advocated by Appellants."

¶60 The BRPA's reliance upon *Addington* is not persuasive for purposes of this issue. *Addington* concerned the quantum of evidence a state was required to provide in order to comport with due process when seeking the involuntary commitment of a mentally ill person. *Addington*, 441 U.S. at 419-20, 99 S. Ct. at 1806. The U.S. Supreme Court

35

explained that "the individual's interest in the outcome of a civil commitment proceeding is of such weight and gravity that due process requires the state to justify confinement by proof more substantial than a mere preponderance of the evidence." *Addington*, 441 U.S. at 427, 99 S. Ct. at 1810. Such individual liberty interests are not at stake here.

¶61 Each side filed pleadings seeking a determination of the status of the Mitchell. Landowners' cross-claim sought a declaration that the Mitchell was an artificial waterway not subject to recreation under the SAL, and BRPA amended its complaint to request the opposite declaration, that the Mitchell was natural and subject to recreational access. The District Court required the parties to meet "the burden of persuasion as to each fact the existence or nonexistence of which is essential to the claim for relief or defense he is asserting," § 26-1-402, MCA, by imposing the burden of preponderance of the evidence on each side.[10] Had the court been faced with just one claim, it is possible that the proof would have been insufficient, the claim dismissed, and the status of the Mitchell left undetermined. However, faced with dueling claims seeking the opposite relief, the court concluded that the Landowners' claim had been established by the evidence and that BRPA's claim had not, thus concluding that the Mitchell was not subject to recreational access.

---

[10] Amici Sportsmen Groups note that the District Court's statement of the burden of proof as a "clear preponderance of the evidence" seems to mix the "clear and convincing" standard with the "preponderance of the evidence" standard. However, lacking further elaboration, we must assume that the District Court simply meant that the applicable "preponderance of the evidence" standard must clearly be met.

¶62 The burden of proof required of the parties by the court was appropriate for the issue and reflected the balance of the Landowners' private property rights and the public's stream access rights. "Both are constitutionally protected." *Galt*, 225 Mont. at 148, 731 P.2d at 916. Thus, we discern no error in the District Court's requirement that Appellants prove their claim that the Mitchell Slough is a natural water body by a "preponderance of the evidence." Whether the District Court correctly concluded that Appellants failed to satisfy that burden of proof is another question, which we next address.

¶63 **C. Did the District Court err by concluding the Mitchell Slough is not a "natural water body" for purposes of the SAL, and therefore not subject to public recreational access?**

¶64 The BRPA and FWP argue that the Mitchell Slough is subject to public recreational use because it was naturally formed, flows perennially, sustains a vibrant fishery, and has been used by fishermen and hunters for decades. According to the BRPA and FWP, the District Court erred by concluding that the Mitchell Slough, though once natural, has been changed into an irrigation ditch or canal by way of physical alterations made by Landowners over the years. In response, Landowners argue that the Mitchell Slough's existence is a demonstration of "the genius of man" which has prevented the Bitterroot River from migrating west and thereby abandoning the Mitchell Slough, which flows through a series of diversions, weirs, and excavations at a higher elevation than the Bitterroot. According to Landowners, the Mitchell Slough has become merely a canal or drain serving the needs of appropriators along its path, and would not

37

exist in its present condition without artificial controls and irrigation inflows from the broader Bitterroot Valley.

¶65 The SAL provides that "all surface waters that are capable of recreational use may be so used by the public without regard to the ownership of the land underlying the waters." Section 23-2-302(1), MCA. The Act defines "surface waters" as "a natural water body, its bed, and its banks up to the ordinary high-water mark." Section 23-2-301(12), MCA. The SAL further provides that this public right of recreational access does not include "the recreational use of waters while diverted away from a natural water body for beneficial use" without "permission or contractual arrangement with the landowner." Section 23-2-302(2)(c), MCA. In turn, the phrase "diverted away from a natural water body" is defined as "a diversion of surface water through a manmade water conveyance system, including but not limited to . . . an irrigation or drainage canal or ditch . . . ." Section 23-2-301(6)(a), MCA.

¶66 The District Court identified the "critical question" before it as whether the Mitchell is a "natural water body" under the SAL, and whether the exceptions under the SAL apply. "Natural" is not defined in the Act, and thus the District Court applied a Webster's Dictionary definition of "natural" as "arising from; in accordance with what is found in nature; not artificial or manufactured." The court concluded that the Mitchell does not fall within this definition. The court noted that the Mitchell may have been a natural water body at some point in the past, but that it is "no longer a natural water body" because the Bitterroot River has, by natural processes, migrated away from and

38

below the elevation of the Mitchell, and the Mitchell itself has been extensively manipulated to ensure a continued, substantial flow. The court reasoned that yearly maintenance at Tucker Headgate and "massive amounts of channel work" have changed the Mitchell enough that it "can no longer be considered a natural channel even though some portions of the channel are still in identifiable historic locations." Though stating its agreement with the proposition that man's manipulations cannot change a natural channel into a manmade ditch, the court concluded that nonetheless "it is only as a result of man's manipulations that the Mitchell maintains any appearance at all of a natural channel." These determinations, combined with its conclusion that Appellants had not proven that natural flows in the Mitchell were "uninfluenced by diverted water[,]" led the District Court to hold that the Mitchell is not a "natural water body" under the SAL.

¶67 Three statutory phrases of the SAL are at issue and must be satisfied for the Mitchell to be subject to public recreational use. They are essentially stated as follows: that the Mitchell is 1) a natural water body 2) capable of recreational use and 3) not diverted away from a natural water body through a manmade conveyance system—one of the SAL's exceptions. Taking the easiest one first—capable of recreational use—there is no dispute that the Mitchell is so capable.[11] Landowners do not rebut BRPA's arguments regarding hunting, boating and, particularly, fishing which has historically occurred on

___

[11] "Recreational use" means with respect to surface waters: fishing, hunting, swimming, floating in small craft or other flotation devices, boating in motorized craft unless otherwise prohibited or regulated by law, or craft propelled by oar or paddle, other water-related pleasure activities, and related unavoidable or incidental uses. Section 23-2-301(10), MCA.

the Mitchell, including BRPA's citation to the testimony of a witness who moved to the area in 1928 and reported extensive fishing along the Mitchell in the years thereafter. For this reason the District Court noted that the dispute before it concerned the other two statutory criteria—that "the Mitchell is not a natural water body and falls under the exceptions to the Stream Access Law . . . ." While these were no doubt the contested issues, the court nonetheless minimized the significance of the Mitchell's recreational capability. Although finding that the Mitchell is used for "fish and wildlife purposes" by landowners who "have altered the condition of the Mitchell in an attempt to develop or enhance fish and wildlife habitat," it reasoned that "whether people have fished or recreated on the Mitchell or whether fish inhabit the Mitchell" or "simply because fish may migrate in and out of the Bitterroot to the Mitchell" is of "little assistance in determining the character of the Mitchell as a natural water body." The District Court thus turned quickly to the question of the Mitchell's status as a natural water body, entering no conclusions of law regarding the Mitchell's capability for recreational use. Our determination of the Mitchell's natural status will incorporate its recreational capability, a fact we will return to in the discussion below.

¶68    As noted, to decide the Mitchell's status, the District Court employed a dictionary definition of natural: "in accordance with what is found in nature; not artificial or manufactured." The District Court's logic followed strictly from this point of beginning, rejecting consideration of any waters flowing in the Mitchell unless they were "uninfluenced" by man in any way. Consequently, for example, the court refused to

attach any significance to irrigation returns flows from the surrounding area, commonly referred to as the Mitchell Catchment and encompassing various irrigation ditches, into the Mitchell Slough because such flows were "not natural water." Rather, the court deemed these waters "artificially imported"—not because they had been imported into the Mitchell Slough itself, but because they had been imported into the surrounding area—and, thus, their eventual flow into the Slough could not be considered natural because of man's previous impact upon them. As Amici Sportsmen's Groups note, "the court means by the phrase 'natural water' water that has *never* been 'diverted.'"

¶69 The Court heard testimony from a number of witnesses qualified as experts in the field of hydrology and reasoned that a dictionary definition of "natural" was "used by most, if not all, of the experts," noting that the "scientific evidence clearly carried the most sway in deciding the critical questions before the Court." Many of the same witnesses who participated in the 310 Law case also testified at the SAL trial, providing similar information to that made available to the BCD. Upon this testimony, the court adopted the Landowners' proposed findings of fact, including Finding of Fact #115, which found that "the Mitchell is not a natural waterbody." The Landowners press this designation on appeal, asserting that "[w]hether the Mitchell is a 'natural water body' is a question of fact . . . . The central issue of this case boils down to a simple factual dispute of whether or not the Mitchell is a natural water body." However, we view the central question as neither simple nor as one of fact.

¶70     By its terms, the SAL requires a determination to be made about whether a stream is a "natural water body."  As a prerequisite to the statute's applicability, that determination is a conclusion of law.  While evidence concerning a stream's natural characteristics may support findings of fact, the ultimate determination of the SAL's interpretation and application is a legal question.  "A statutory interpretation is a conclusion of law, which we review to determine whether the district court's interpretation of the law is correct."  *State v. Price*, 2002 MT 150, ¶ 15, 310 Mont. 320, ¶ 15, 50 P.3d 530, ¶ 15.  Thus, whether the Mitchell is a natural water body for purposes of the SAL is ultimately a conclusion of law.

¶71     In addition, we have not found the application of this statutory term to be as simple and straightforward as a dictionary definition might permit.  The expert testimony which provided opinions about the "naturalness" of the Mitchell in accordance with a dictionary definition of the term was logical in a scientific sense.  As we noted in the 310 Law case, we certainly do not reject the use of such scientific evidence.  However, in addition to considering the evidence, we have the additional duty of interpreting the law—here, applying a statute "to implement the objectives that the Legislature sought to achieve," *Boettcher v. Montana Guaranty Fund*, 2007 MT 69, ¶ 19, 336 Mont. 393, ¶ 19, 154 P.3d 629, ¶ 19, in accordance with our precedent previously addressing the SAL.

¶72     The record reveals that man's impact upon the waters at issue begins long before those waters reach the Mitchell Slough.  The Bitterroot River is migrating to the west. Although the District Court noted that it is not man's manipulations which are causing

42

this migration, man has responded to the migration by manipulating the West Fork of the Bitterroot to force more water down the East Fork, from which the Tucker Headgate moves water into the Mitchell. One rancher testified that the Bitterroot River "wants to go to the west, so we have to keep bringing it back." Bruce Anderson, an expert hydrologist for the Landowners, testified that many Montana rivers have likewise been channelized and reshaped, and have had weirs and diversion structures placed in them. At Painted Rocks Reservoir, man manipulates the water by first impounding it and then releasing it to feed the Bitterroot River in late summer. Under a definition of "natural" which rejects consideration of water flows on which man has had any impact, precious little water in the Mitchell Slough could be considered natural—and, for that matter, flows within the Bitterroot River might not qualify either. Under cross examination, Bruce Anderson testified as follows:

Q. And you would agree with me that, in your familiarity with the Bitterroot Valley, the whole surface and groundwater in the valley has, in fact, been altered by humans?

A. That's true.

Indeed, under this narrow interpretation, few Montana streams and rivers would qualify as "natural." FWP notes the testimony of Chris Clancy, a Department expert in streams and fisheries:

Q. Are there any mainstem rivers—I'm talking about the Yellowstone, the Missouri, the Beaverhead, Gallatin—any mainstem rivers in Montana that have not been altered by humans?

A. None that I'm aware of.

43

Under a technical or scientific definition of natural, recreational access under the SAL could be drastically limited. We thus conclude that the District Court's dictionary-based definition, which essentially requires a pristine river unaffected by humans in order to be deemed "natural," results in an absurdity: for many Montana waters, the SAL would prohibit the very access it was enacted to provide. "Statutory construction should not lead to absurd results if a reasonable interpretation can avoid it." *Mont. Sports Shooting Ass'n v. State*, 2008 MT 190, ¶ 11, 344 Mont. 1, ¶ 11, 185 P.3d 1003, ¶ 11.[12]

¶73 Whether man has impacted a waterway is certainly an appropriate consideration, but a more appropriate statement of the issue focuses on how and to what extent man has impacted the waterway. Evidence of the extent of man's efforts must be considered in conjunction with all other circumstances in a fact-driven inquiry. Amici Stockgrowers has stated the proposition well: "There is simply no requirement in the law that a man-made conveyance system may not make use of natural features, nor is there a requirement that a natural water body must exist in a pristine, untouched condition. Rather, the analysis required by the Stream Access Law is fact dependent." Thus, the mere fact that man has influenced a waterway does not require its exclusion from access provided under the SAL. All of the salient facts and circumstances must be considered in the

---

[12] We do not mean to imply that the District Court's approach would inevitably lead to a determination that Montana rivers such as the Missouri, Yellowstone or Bitterroot are unnatural and unavailable for use under the SAL. We merely conclude that such a definition of natural is too narrow and unrealistic as a starting point, given the pervasive reach of man's previous impact upon state waters.

determination. With this reversal of the District Court's interpretation of the statutes as an error of law, we turn to the facts and circumstances regarding the Mitchell Slough.

¶74 In the Nineteenth century, the Mitchell Slough was substantial enough to support the irrigation needs of three ditch companies: the Union, Etna, and Webfoot. The District Court noted that perhaps "as early as 130 years ago the Mitchell Slough may well have been considered a natural water body . . . ." At that time, the Mitchell Slough appeared to be a side-channel of the Bitterroot River, and an 1872 GLO Survey Map reflects a channel which overlaps to some degree the Mitchell's present location.[13] The District Court found that, in 1915, a project to improve flow to the Union, Etna, and Webfoot Ditches included the construction of a concrete diversion dam across the Bitterroot "to divert water . . . into a side channel of the river, where a dependable supply of water would be available at all times to the three ditch systems," and that this "side

---

[13] The Landowners' Proposed Findings of Fact adopted by the District Court are somewhat contradictory on this point. Although Finding #71 acknowledges that "the Mitchell and GLO map features may be in the same vicinity in certain areas," Finding # 73 states that "the Mitchell is not in the same location as features depicted in the 1872 GLO survey." The BCD, whose findings were judicially noticed, found that "[n]one of the water courses indicated on the 1872 GLO map corresponds precisely to the Mitchell as it presently exists although several of the sections of the channel of the Mitchell are co-extensive with the Slough on the 1872 GLO map." The District Court indicated that the Mitchell was a natural water body 130 years ago, and there appears to be no dispute that the Mitchell is currently near in location to the slough designated on the 1872 map, despite the court's further finding that many "features" on the map are no longer in the same location. In its narrative order, the District Court concluded that "some portions of the channel are still in identifiable historic locations."

channel" of the Bitterroot was the Mitchell Slough.[14]  The Tucker Headgate was placed in its current location in the 1940's and a quarter-mile canal was dug to connect the Mitchell with this new diversion point.

¶75   It is not disputed that the Mitchell flows perennially, whether in or out of irrigation season, and that the Mitchell's flow increases during its course.  Measurements taken out in February 2001, by the U.S. Geological Survey found that the flow below Tucker Headgate was 18.2 c.f.s.  The combined discharge of the east and west branches of the Mitchell as they flowed back into the Bitterroot was 43.9 c.f.s., or a gain of 25.7 c.f.s.  Dr. Kendy estimated that, when the discharge from the Mitchell into Bushy Creek, which also empties back into the Bitterroot, was added in, the total flow from the Mitchell into the Bitterroot would be approximately 60.45 c.f.s., or an increase of about 42.25 c.f.s. over the flow measured below Tucker Headgate.

¶76   There are various sources for this increased flow and the most significant source was found by the District Court to be irrigation return flows and drain waters.  "[B]ecause of the tremendous amount of irrigation and drain water imported into the Mitchell catchment from upstream River diversions and ditch systems, irrigation waste water and return flows contribute to the Mitchell on a year round basis."  The District Court explained the sources of these waters more specifically as follows:

> This water is water that is artificially imported into the Mitchell catchment from the Bitterroot River and upstream reservoir releases, including water

---

[14] Quotes are from the *Ravalli County Water Resources Survey, Part I:  History of the Land and Water Use on Irrigated Areas*, 1958, p. 50.  *See* District Court's adopted Findings of Fact ## 19 and 46.

from the Montana Department of Natural Resources and Conservation's . . . Painted Rocks Reservoir, by the extensive system of ditches and drains east and south of the Mitchell. This water and its influence on the hydrology of the Mitchell are dramatic and is not a natural condition.

Thus, after finding that the Mitchell served to collect and conduct the significant volume of water which drained from the entire area—including lands irrigated by water from other water bodies and diversions—the District Court determined that these collective flows must be considered "artificial" and "not natural." By so doing, the District Court eliminated consideration of the Mitchell's most significant source of flow, except for the Tucker Headgate, and the primary reason that the Mitchell's flow increases over its 16-mile pathway. We conclude that this exclusion, arising from the initial narrow definition of natural, was in error. Many Montana streams carry discharged irrigation flows. As we held in *Hidden Hollow*, "where . . . vagrant, fugitive waters have finally collected and reached a natural channel, and thus lose their original character as seepage, percolating, surface, or waste waters, and flow with such regularity," such waters become a watercourse for purposes of appropriative water rights. *Hidden Hollow*, ¶ 31. The Mitchell serves as a conduit for more irrigation wastewater than just the water it provides for irrigation; irrigation returns from the surrounding area also flow into the Mitchell. This collection serves a greater purpose than merely draining the fields it sources and

47

should not, without more, be considered an "unnatural" occurrence. Rather, the Mitchell serves as the watercourse from which such waters can again be appropriated.[15]

¶77    Application of the analogy from appropriative water law as expressed in *Hidden Hollow* requires the conclusion that the Mitchell is a watercourse flowing in a "natural channel," and thus we depart momentarily from our consideration of whether the Mitchell's waters are "natural" and turn to the allied question of whether the Mitchell Slough is "a manmade water conveyance system." Section 23-2-301(6), MCA. This is an exception to the SAL's provision of public access to surface waters which are capable of recreational use. Though requiring an inquiry which, in this case, overlaps factually with the question of the naturalness of the Mitchell, the exception focuses more directly upon the origin and nature of the channel and its role in conveying water diverted by Tucker Headgate and funneled through the 400 yard canal dug to the Mitchell. Referencing these functions, and noting the other extensive improvements they have made, the Landowners argue that the Mitchell Slough "is, in fact, a man-made water conveyance system" which "exists only because of man's manipulations."[16]

¶78    The claim that man has made the Mitchell Slough is a bold one, indeed. The Landowners were necessarily ambitious in undertaking proof of the claim, providing a

---

[15] Water appropriators are permitted to direct water into "the natural channel of another stream," § 85-2-411, MCA, but doing so, as discussed herein, does not render either the flow or the channel "unnatural."

[16] The District Court did not explicitly reach and determine if the "manmade water conveyance system" exception to the SAL applied. However, it did note that from "massive amounts of channel work . . . the channel itself is so changed that it can no longer be considered a natural channel."

48

mountain of evidence to support the District Court's findings of fact detailing the extensive alterations made by man along the 16-mile course of the Mitchell. This ambitious effort to demonstrate man's impact was necessary in light of the long historical record of the Mitchell as a water body. The District Court acknowledged that, 130 years ago, the Mitchell was a natural water body which may have then qualified as such under today's SAL, and it is undisputed that water has flowed through the Mitchell Slough ever since. Except for the canal directly below the Tucker Headgate, dug to connect the Mitchell with the Tucker Headgate diversion, there is no evidence that the Mitchell's 16-mile channel was originally dug or created by humans. It was naturally formed and significant portions of the channel remain in its historic location.

¶79 Although briefly mentioning this historical evidence, the District Court gave short shrift to it in favor of man's relatively recent work upon the Mitchell, particularly over the past fifteen to twenty five years: "landowners have conducted extensive alterations of the Mitchell since approximately the mid-1980s to establish the Mitchell's now stream-like characteristics"; "since at least the 1990s, this reach of the Mitchell has undergone systematic alteration by the owners . . . ." However, although more recent efforts undertaken for the benefit of the irrigators using the Mitchell have altered it into something other than the pristine side-channel of the Bitterroot River that it once was, it cannot be concluded from this record that the Mitchell's 16-mile channel lost its original natural character by such work and was transformed into a "manmade" conveyance system. Man-improved, certainly, but not man-made. While the Tucker Headgate, the

49

400 yard canal and other improvements were certainly man-provided, too much of the Mitchell's physical channel, and too many of the functions served by the channel, are provided by nature to be able to conclude that it has since become man-made. The District Court's statements, although not entering specific conclusions on this issue, were essentially incorrect conclusions of law to the effect that the Mitchell could no longer be considered natural under the SAL. The correct conclusion is that return flows which find their way to and join the flow in the Mitchell's historic channel are appropriately analyzed as freed, appropriative waters by analogy to *Hidden Hollow*.

¶80     These return flows are joined by other flows into the Mitchell, including groundwater recharge and natural springs.[17]  One by one, the District Court listed and then discounted these sources in its findings, pursuant to its definition of natural. For example, the court stated:  "While springs may exist in the northern reaches of the east branch of the Mitchell, it is abundantly clear that these features exist mainly, if not entirely, due to the impacts of upgradient applied irrigation water into the Mitchell catchment"; and, "because of the magnitude of irrigation water artificially imported in to the Mitchell catchment, groundwater levels along the Mitchell and in the area to the east and west of the Mitchell are artificially elevated."  However, for the reasons explained above, the waters from these sources should also have been considered as natural flows.

¶81     In its narrative order, the District Court noted that "there is a healthy, breeding fish population in the Mitchell which is some evidence of a natural water body."  However,

---

[17] An expert for the Landowners testified that 27.25 cfs of the 74 cfs total flow in the Mitchell during one non-irrigation season measurement was attributable to groundwater.

the court backed away from this initial observation, stating in its narrative order that the fish population "was not a factor to be heavily considered," and stating in the adopted findings that the presence of fish was "of little assistance in determining the character of the Mitchell as a natural water body." Although we agree that the presence of fish alone does not make a water body natural, it is one fact to be considered in the determination, both of a stream's recreational capability and its naturalness. The "healthy, breeding fish population" found by the District Court, and the undisputed past use of the Mitchell for other recreational uses such as hunting and boating, support the Mitchell's satisfaction of these statutory requirements. Indeed, the evidence includes Chris Clancy's testimony that electrofishing surveys of the Mitchell in the early 1980s—prior to any major restoration effort—revealed an eclectic mix of rainbow, brown and a few cutthroat trout, northern pike minnows, suckers and a number of "redds," or trout nests. Further, there are no private pond licenses on the Mitchell. The fish are a public resource.

¶82 Of course, the primary source of water in the Mitchell, even though it does not account for all of the flow, is the water diverted by Tucker Headgate. The District Court stated in its findings that "the undeniable fact that water is diverted away from the East Channel of the Bitterroot River in the Mitchell and is conveyed via the Mitchell for use by water users along its reach is a critical fact in determining" the Mitchell's status. It is indeed a critical fact, one which most obviously demonstrates man's influence. However, it should be remembered that installation of the Tucker Headgate and the digging of the canal were completed to alter the manner in which water naturally flowed

51

from the Bitterroot into the Mitchell. The passage of water from the Bitterroot into the Mitchell had naturally occurred prior to these alterations, perhaps from time immemorial. Man enhanced the flow with this alternative diversionary mechanism, but it cannot be said that such efforts unilaterally changed the Mitchell from natural to unnatural. Further, while it is clear that the Tucker Headgate is a man-made device providing flows into the Mitchell, it is also clear from the record that the year-round diversion at Tucker provides more water than necessary to satisfy irrigation needs during irrigation season and, year-round, provides more water than necessary to satisfy other appropriative needs, such as stock watering and fisheries. Thus, there is more "going on" here than simply a diversion of water to satisfy water rights. The "huge volume of water" which the District Court noted was diverted by Tucker Headgate dedicates a public resource to a multiplicity of functions discussed herein. Thus, while the Mitchell has been improved primarily by irrigators, it is much more than an irrigation ditch. If the Mitchell was simply an irrigation ditch, there would likely be little or no water flowing in it outside of irrigation season. Here, however, the Mitchell flows year-round and presents the characteristics of a stream throughout all seasons, a condition which, as the District Court acknowledged, has been enhanced by the Landowners.

¶83 The District Court erred in its conclusions of law interpreting the SAL. Its definition of "natural" was too narrow and inconsistent with the purposes of the SAL. The narrow definition incorrectly excluded from consideration of the Mitchell's status significant water flows and other natural characteristics which should have been included.

52

Upon these errors, the court incorrectly concluded that BRPA and FWP had failed to sustain their burden to prove by a preponderance of the evidence that the Mitchell was a natural water body, and that it was not a manmade water conveyance system. When these errors of law are corrected, and upon consideration of the factual record, it is clear that the Plaintiffs met their burden of proof. This "fact dependent" inquiry demonstrates that the Mitchell Slough consists of surface water capable of recreation, and cannot be considered a "manmade" water conveyance system. When the water is diverted from the Mitchell into manmade ditches such as the Etna, Union, and Webfoot, constructed to carry water to irrigation sites, then the manmade conveyance exception is applicable, and recreation thereon is not permitted.

¶84 The Mitchell flows through private property. What we have previously emphasized we once again repeat: "nothing herein contained in this opinion shall be construed as granting the public the right to enter upon or cross over private property to reach the State-owned waters hereby held available for recreational purposes." *Curran*, 210 Mont. at 55, 682 P.2d at 172. The Landowners are entitled to every expectation of the peaceful enjoyment of their property and the exclusive use thereof, excepting only the public's right to recreate as provided by the SAL on the water and on the banks of the Mitchell "up to the ordinary high-water mark." Section 23-2-301(12), MCA. "The right of the public to make recreational use of surface waters does not grant any easement or right to the public to cross private property in order to use such waters for recreational purpose." Section 23-2-302(4), MCA. Specific kinds of recreational uses which would

53

otherwise be prohibited on the Mitchell under the provisions of the SAL are not at issue here and thus remain prohibited in accordance with the SAL's provisions.

¶85   In conclusion, the Mitchell Slough is subject to stream access and public recreation as provided by the SAL.  We reverse the judgment and remand for entry of a judgment in favor of BRPA and FWP.

/S/ JIM RICE

We concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ PATRICIA COTTER
/S/ JAMES C. NELSON
/S/ BRIAN MORRIS
/S/ DOROTHY McCARTER
Hon. Dorothy McCarter, District Judge,
sitting for Justice W. William Leaphart