DA 09-0429

IN THE SUPREME COURT OF THE STATE OF MONTANA

2010 MT 203

CHRISTIAN C. HOHENLOHE and NORA R. HOHENLOHE,

Petitioners and Appellees,

v.

STATE OF MONTANA, DEPARTMENT OF
NATURAL RESOURCES AND CONSERVATION,

Respondent and Appellant.

APPEAL FROM: District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. BDV 08-750
Honorable Dorothy McCarter, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Anne W. Yates (argued) and Kevin R. Peterson, Department of Natural
Resources and Conservation, Helena, Montana

For Appellees:

Abigail J. St. Lawrence (argued) and John E. Bloomquist, Doney,
Crowley, Bloomquist, Payne, Uda, P.C., Helena, Montana

For Amicus:

Stan Bradshaw, Attorney at Law, Helena, Montana (MT Trout Unlimited)
Barbara Hall, Attorney at Law, Missoula, Montana (MT Water Trust)
Hertha L. Lund, Wittich Law Firm, P.C., Bozeman, Montana (MT Farm
Bureau Federation)

Argued: April 7, 2010
Submitted: May 11, 2010
Decided: September 21, 2010

Filed:

_____
Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1 The Montana Department of Natural Resources and Conservation (Department) appeals from an order of the First Judicial District Court, Lewis and Clark County, ordering the Department to grant the change of use application filed by Christian and Nora Hohenlohe (Hohenlohes). We reverse and remand to the Department for further proceedings consistent with this opinion.

¶2 We review the following issue on appeal:

¶3 *Did the Department abuse its discretion in denying Hohenlohes' change of use application?*

FACTUAL AND PROCEDURAL HISTORY

¶4 Hohenlohes purchased the Sentinel Rock Ranch in Lewis and Clark County in 1999. Hohenlohes obtained Water Right Nos. 41QJ-17073 and 41QJ-17074 on Little Prickly Pear Creek as appurtenances to their purchase. These rights have priority dates of August 22, 1892, and May 17, 1890, respectively. The rights comprise a combined flow rate of 32.5 cubic feet per second (cfs), according to the water right abstracts.

¶5 Hohenlohes applied for and received a grant from the Department of Fish, Wildlife, and Parks (FWP) to convert approximately 150 acres of their land from flood to sprinkler irrigation. The conversion resulted in a significant water savings. A condition of the grant required Hohenlohes to leave the excess or "salvage" water instream pursuant to § 85-2-408, MCA. This stipulation required that Hohenlohes leave the salvaged water instream for at least thirty years.

2

¶6    Hohenlohes filed an application under §§ 85-2-402, -407, and -408, MCA, on December 13, 2004, for a temporary change of irrigation water rights to instream flow. Hohenlohes' application sought to change the existing 32.5 cfs flood irrigation right to a combined right comprising 3.5 cfs for sprinkler irrigation and designating the remaining 29 cfs as instream flow under § 85-2-408, MCA.

¶7    Hohenlohes supported their change of use application with an affidavit of the former ranch owner, J.C. Kantorowicz (Kantorowicz affidavit), a letter from George Liknes, Regional Fisheries Manager for FWP, ditch capacity calculations prepared by the Department, and testimony of John Westenberg, a hydrologist and former Department employee. Hohenlohes claimed, based on the Kantorowicz affidavit, that the ditch headgate at the point of diversion would support 36 to 40 cfs. The Kantorowicz affidavit further stated that the ditch had been filled to capacity, subject to water availability, during Kantorowicz's tenure from 1948 to 1999. The Department calculated Hohenlohes' ditch capacity to be up to 34 cfs.

¶8    Hohenlohes also provided information on historic flow rates for Little Prickly Pear Creek from a U.S. Geological Survey gauging station located half a mile upstream from their point of diversion. These records provided data on water availability in cubic feet per second from 1961 through 2007. The flow rate in Little Prickly Pear Creek—averaged over the forty-six year period—ranged from a mean low of 40 cfs in January to a mean maximum flow rate of 278 cfs in June.

¶9     The Department's engineer conducted a site inspection and determined, based on the soil type and topography of the ranch, that 1,863 acre feet (AF) of water would constitute a more reasonable volume to flood irrigate 193 acres of alfalfa. The Department further determined, based on the Montana Irrigation Guide, that 372 AF of water constituted the consumptive use for 193 acres of alfalfa.

¶10    Hohenlohes installed five sprinkler pivots in 2004. The Department conducted a field investigation on August 22, 2005. The Department deemed Hohenlohes' application "correct and complete" on October 4, 2005, and issued its environmental assessment on October 18, 2005. The Department issued a public notice of the proposed change on November 17, 2005.

¶11    Josephine M. Lahti (Lahti), the lone downstream right holder on Little Prickly Pear Creek, filed the sole objection to the application on December 16, 2005. Lahti withdrew her objection on May 31, 2007, pursuant to a settlement agreement with Hohenlohes. The Department cancelled the scheduled contested case hearing on Lahti's objection on June 6, 2007, and remanded the matter to the Helena regional office to analyze whether Hohenlohes had complied with § 85-2-402, MCA.

¶12    The Department issued a Statement of Opinion on January 28, 2008, recommending denial of Hohenlohes' application. Jan Langel (Langel), Helena Regional Manager for the Department, authored the Statement of Opinion. Langel cited as grounds for denial that Hohenlohes had failed to present sufficient evidence of historic consumptive use to show

4

that downstream right holders would not be affected adversely by their proposed change of use. Hohenlohes requested a hearing on the Statement of Opinion on February 11, 2008.

¶13 The Department granted Hohenlohes' request for a show cause hearing, but appointed Langel as hearings examiner. Hohenlohes immediately moved to disqualify Langel on grounds of bias, lack of independence, and denial of due process. The Department denied Hohenlohes' disqualification request. The Department reasoned that Langel possessed the greatest knowledge of Hohenlohes' application and was therefore the most appropriate person to preside over the hearing.

¶14 Hohenlohes also objected to the Department's decision to conduct the hearing under the informal contested case proceedings of § 2-4-604, MCA. Hohenlohes based their objection on a letter dated March 14, 2008, from the Department Water Rights Division Administrator to Hohenlohes that had characterized the denial of Hohenlohes' application as being subject to formal proceedings under the Montana Administrative Procedure Act (MAPA). Langel noted this objection for the record, but did not institute formal proceedings.

¶15 Hohenlohes next moved the Department to issue the change permit under the reasoning of the Eighteenth Judicial District Court, Gallatin County, in *Bostwick Props., Inc. v. Mont. Dept. of Nat. Resources & Conserv.*, Cause No. DV-07-917AX (Mont. 18th Jud. Dist. May 12, 2008). Bostwick had applied to the district court for a writ of mandate directing the Department to issue its change of use application after the Department had exceeded the 180 day statutory deadline imposed by § 85-2-310(1), MCA (2007), "to grant,

5

deny, or condition an application." *Id.* at 8.

¶16 The district court ordered the Department to appear at a hearing concerning the writ. The Department finally issued a statement of opinion recommending denial of Bostwick's application only after Bostwick had sought judicial relief. *Id.* at 8-9. The Department also assigned as the hearing examiner the same official who had written the statement of opinion recommending denial of Bostwick's application. *Bostwick Props., Inc. v. Mont. Dept. of Nat. Resources & Conserv.*, 2009 MT 181, ¶ 29, 351 Mont. 26, 208 P.3d 868 (Rice, J., concurring). The district court granted Bostwick's motion based on these procedural abuses. *Bostwick*, Cause No. DV-07-917AX, at 32.

¶17 The Department deemed Hohenlohes' application correct and complete on October 4, 2005. Langel did not issue the Department's Statement of Opinion until January 28, 2008— 742 days after the objection deadline had passed and 237 days after Lahti had withdrawn her objection. Hohenlohes argued that the Department had no option under *Bostwick* other than "the ministerial action of granting the permit." *Id.* at 28. This Court later reversed the district court in *Bostwick* on the basis that the granting of a change permit does not constitute a ministerial act subject to a writ of mandate. *Bostwick*, 2009 MT 181, ¶ 21. The Department denied Hohenlohes' motion to issue the permit.

¶18 The Department finally conducted the show cause hearing on June 24, 2008. Hohenlohes presented the testimony of George Liknes, the Department Regional Fisheries Manager, and John Westenberg, Senior Water Rights Specialist and a former Department employee. Hohenlohes introduced into the administrative record a number of exhibits,

6

including photographs, correspondence, affidavits, and maps. The Department issued its final order denying Hohenlohes' application on July 28, 2008.

¶19 The Final Order adopted the reasoning of the Department's earlier Statement of Opinion. The Department found that Hohenlohes had provided sufficient information to support their claimed diverted flow rate, but had failed to prove historic consumptive use. The Department further determined that Hohenlohes had failed to meet their burden under §§ 85-2-402 and -408, MCA, because the consumptive volume implicated return flow analysis and potential impacts to downstream users. The Department specifically found that Hohenlohes' application had failed to provide information on the frequency and timing of diversion.

¶20 Hohenlohes petitioned for judicial review pursuant to § 2-4-704, MCA. The District Court granted Hohenlohes' petition on June 10, 2009. The District Court declared itself "at a loss" as to how "such a beneficial change" could be denied. The court specifically determined the Department's findings of fact and conclusions of law regarding historic use, adverse effect, and salvage water to be both clearly erroneous, as well as arbitrary and capricious under § 2-4-704(2), MCA, of MAPA.

¶21 The District Court based its determinations on evidence and testimony concerning the benefits that had accrued to the waterway and its fishery since Hohenlohes' conversion to sprinkler irrigation. The court relied heavily on the fact that Hohenlohes' asserted water right could dewater Little Prickly Pear Creek. The court concluded that "no showing was made by DNRC that Hohenlohes' current use of the water is wasteful." The District Court

7

also determined that neither § 85-2-402, MCA, nor § 85-2-408, MCA, required analysis of return flows. The court reached this determination based on the fact that § 85-2-408(7), MCA, does not contain the term "return flows." The District Court concluded that "so long as the increased stream flows do not adversely affect downstream users . . . these types of change requests should be summarily granted." The Department appeals.

STANDARD OF REVIEW

¶22 A district court reviews an agency's decision under § 2-4-704, MCA. A court must confine its review of an agency's decision to the record. The reviewing court may not substitute its judgment for that of the agency as to the weight of the evidence. Section 2-4-704(1)-(2), MCA. This Court employs the same standard when reviewing the district court's decision. *Denke v. Shoemaker*, 2008 MT 418, ¶ 39, 347 Mont. 322, 198 P.3d 284.

¶23 This Court employs a three-part test to determine whether an agency's findings of fact are clearly erroneous: 1) we review the record to see if substantial evidence supports the findings, 2) if substantial evidence supports the findings, we determine whether the agency misapprehended the effect of the evidence, and 3) if both of the above are satisfied, we still may decide a finding is clearly erroneous if a review of the record leaves the Court with the definite and firm conviction that a mistake has been committed. *Owens v. Mont. Dept. of Revenue*, 2007 MT 298, ¶ 13, 340 Mont. 48, 172 P.3d 1227. Finally, we review for correctness an agency's conclusions of law. *Owens*, ¶ 12.

DISCUSSION

8

¶24   *Did the Department abuse its discretion in denying Hohenlohes' change of use application?*

¶25   Representatives from the agricultural, recreation, and conservation communities developed the instream flow provisions of the Montana Water Use Act. The legislature ratified the provisions in 1995. Sections 85-2-408, -439, MCA (1995). The provisions authorized "the temporary use of existing water rights for instream flow to benefit the fishery resource . . . within the prior appropriation water rights system." Statement of Intent, Mont. H. 472, Sec. 1, Ch. 322, L. 1995 (Mar. 31, 1995). The provisions proved so successful that at the termination of the ten year sunset period provided for by the 1995 Act, the 2005 legislature approved amendments that made permanent the instream flow provisions and allowed for a maximum lease term of thirty years. Mont. H. 308, Sec. 6, Ch. 85, L. 2005 (Mar. 24, 2005). The amendments also merged a separate provision that had applied only to the Clark Fork River into the statewide provisions and adopted as § 85-2-408(7), MCA, the language from a 1989 FWP leasing statute. *Id*.; *see also* §§ 85-2-408(7), MCA (2005), 85-2-436, MCA (1989).

**A.   The Department's Review of a Change of Use Application for Instream Flow Does Not Constitute Adjudication of an Applicant's Water Right.**

¶26   The Department claims on appeal that the District Court improperly substituted its judgment for that of the Department as to two factual issues: 1) the determination of the historic volume of Hohenlohes' water rights, and 2) the analysis of return flows. The Department argues that the District Court impermissibly shifted the applicant's burden to the agency when it determined that Hohenlohes had no statutory obligation to analyze return

9

flows to demonstrate historic consumptive use. The linchpin of the Department's argument appears to be that without a "complete" return flow analysis, applicants will attempt to use a temporary instream flow conversion to parlay an inefficient flood irrigation right into a much larger consumptive use right. The Department reasons that if water historically diverted, but used only for conveyance purposes, is approved for instream use under § 85-2-408, MCA, that water may, at the expiration of the lease, be converted to a consumptive use. The extensive statutory safeguards that exist to prevent this type of bootstrapping undermine the Department's reasoning.

¶27 Section 85-2-407(6), MCA, provides that a temporary change automatically reverts to its "permanent purpose, place of use, point of diversion, or place of storage" at the expiration of the lease or conversion period. This reversion applies to both the consumptive and non-consumptive components of the subject water right, encompassing both the proportional and actual quantities of water represented by them. The original appropriator may salvage the non-consumptive portion of a water right diverted for beneficial use, but lost to seepage. Section 85-2-419, MCA. The appropriator may use or sell salvage water for a beneficial use, including instream flow. *Id.* This historically non-consumptive portion of a water right, or salvage water, may be changed to instream flow (also a non-consumptive use). This salvage water automatically will revert to its original non-consumptive use, however, at the conclusion of the lease or conversion period. The statutory provisions specifically protect against any effort by an appropriator to bootstrap a non-consumptive use—such as carriage, seepage, or wastewater that has been salvaged—into a consumptive use or to enlarge the

10

flow rate that may be used consumptively. A temporary change will remain in effect, moreover, if the water right to which it is attached is transferred as an appurtenance to real property "unless otherwise authorized by the department." Section 85-2-407(8), MCA.

¶28 Sections 85-2-407 and -408, MCA, proscribe any change of use that would affect adversely another water user and contain affirmative provisions safeguarding the rights of other users. An instream flow change applicant may not, as a matter of law, expand a consumptive use right by means of a temporary change to instream flow. Section 85-2-407(6), MCA. An instream flow change applicant likewise may not convert the non-consumptive portion of a water right to a consumptive use. *Id.* More importantly, the Department's decision to approve a temporary change to instream flow in no way constitutes a quantification of the applicant's water right. The Department lacks authority to determine the quantity of a water right for purposes of adjudication.

¶29 The Montana Water Court possesses exclusive jurisdiction to determine quantities of water rights and issue decrees as part of the statewide adjudication process. Sections 3-7-501, 85-2-216, MCA. Montana law further provides that the adjudication process—and not a permit for a new appropriation or change of use issued by the Department—provides the sole forum in which a water right holder may quantify and ascertain his water right. *Id.*; *see also* § 85-2-101(5), MCA. We emphasize that under Montana law, Hohenlohes' proposed change to instream flow would revert at the end of the conversion period to its permanent purpose (flood irrigation), its place of use (the Sentinel Rock Ranch), and its former point of diversion (Little Prickly Pear Creek). Section 85-2-407(6), MCA.

11

¶30 Hohenlohes raise their own claim that the Department lacks authority to "quantify" their water right. Hohenlohes argue that the Department's requirement of a volume metric in change applications constitutes an adjudication of their water rights that invades the province of the Water Court. Hohenlohes cite *McDonald v. State*, 220 Mont. 519, 722 P.2d 598 (1986), for the proposition that "volume is an inappropriate metric of direct flow irrigation rights." Hohenlohes mischaracterize *McDonald*. This Court in *McDonald* actually rejected a constitutional challenge to the use of volume to quantify decrees. *McDonald*, 220 Mont. at 535, 722 P.2d at 608.

¶31 The Department's regulatory provisions comport with this holding by requiring applicants for a change of use to state both flow rate and volume. Admin. R. M. 36.12.1902(7). Hohenlohes' water rights, regardless of whether they are approved for change of use by the Department, remain subject to final adjudication and quantification by the Water Court. Section 85-2-101(5), MCA. The Department's use of volume in the processing of change applications does not constitute adjudication. The volume represents the amount of water available for a willing lessee or right holder to devote to instream flow use during the lease or conversion period. As a result, we do not attempt in any manner to quantify Hohenlohes' water right. Our analysis focuses instead on the two central issues: 1) whether Hohenlohes have met their statutory burden of demonstrating that the proposed change of use for instream flow would have no adverse effect on the rights of other water users, and 2) the scope and application of the Department's discretion pursuant to §§ 85-2-

402(8) and -408(7), MCA, to limit the amount, or otherwise condition the amount of an applicant's water right that may be protected as instream flow.

**B.      The Applicant's Burden Under §§ 85-2-402(2) and -408(3), MCA.**

¶32     The Water Use Act requires an applicant who seeks a change of use for instream flow to prove by a preponderance of the evidence that certain criteria have been met. Sections 85-2-402(2), -408(3), MCA. The criteria applicable to instream flow change applications include lack of adverse effect to other right holders, evidence that the proposed change constitutes a beneficial use, proof that any proposed water saving methods will salvage the amount of water asserted by the applicant, and evidence that the amount of water claimed is necessary to benefit the fishery. *Id.*

¶33     The first criteria of lack of adverse effect provides the only point of contention and thus we will examine whether Hohenlohes' change of use application would affect adversely other right holders. The Department must grant the change application if an applicant has demonstrated the statutory criteria by a preponderance of the evidence. Section 85-2-402(2), MCA. A preponderance requires that the applicant meet the relatively modest standard that the statutory criteria are "more probable than not" to have been met. *Narum v. Liberty Northwest Ins. Corp.*, 2009 MT 127, ¶ 28, 350 Mont. 252, 206 P.3d 964.

¶34     The Department points specifically to *In re Royston*, 249 Mont. 425, 428, 816 P.2d 1054, 1057 (1991), for the proposition that the applicant bears the burden to satisfy the statutory requirements for a change of use. This Court upheld the Department's determination in *Royston* that an applicant had failed to present substantial credible evidence

13

to support its change of use application. *Id.* at 432, 1060. We rejected the applicant's claim that the burden of demonstrating lack of adverse effect rested with the objector to a change of use application rather than with the applicant. *Id.* at 428, 1057. This Court noted that the burden indeed had rested with the objector before the adoption of the Water Use Act in 1973. The adoption of the Water Use Act, and the 1985 amendments to § 85-2-402(2), MCA, had shifted that burden squarely to the applicant. *Id.*

¶35 Neither party disputes that the burden to prove the statutory criteria rests with the applicant. *Royston*, therefore, provides no significant guidance. The parties disagree as to whether Hohenlohes met their burden. To resolve this question, we must clarify the scope of the applicant's burden under §§ 85-2-402 and -408, MCA. Both § 85-2-402(2) and § 85-2-408(3), MCA, require that the applicant prove certain criteria by a preponderance of the evidence.

¶36 Each provision itemizes the criteria that must be proven by a preponderance of the evidence. Section 85-2-402(2), MCA, contains the requirements that all change of use applicants must prove by a preponderance of the evidence. Section 85-2-402(2)(a)-(g), MCA. Section 85-2-408(3), MCA, imposes additional criteria that must be proven by a preponderance of the evidence by instream flow applicants. Section 85-2-408(3)(a)-(b). Both sections impose a number of additional limitations on change of use applicants that are listed separately from the criteria that must be proven by a preponderance as part of the applicant's burden to demonstrate lack of adverse effect to other right holders. Sections 85-2-402, -408, MCA. For example, § 85-2-408(6), MCA, provides that a temporary change

14

authorization for instream flow does not create a right of access across private property. This stipulation is unrelated to the criteria that an applicant must prove by a preponderance of the evidence under § 85-2-408(3), MCA. Likewise, § 85-2-408(7), MCA, constitutes an entirely separate provision from the statutory criteria listed under § 85-2-408(3), MCA. Subsection (7) limits the amount of water that may be changed to instream flow and grants the Department the authority to further limit that amount. Section 85-2-408(7), MCA. Subsection (7) does not impose an additional requirement that must be proven by the applicant.

¶37 The applicant's burden extends, therefore, to adduce proof by a preponderance of the evidence that the criteria listed at §§ 85-2-402(2)(a)-(g) and 85-2-408(3)(a)-(b), MCA, have been met. The showing required of the applicant under these provisions undoubtedly will contribute to the calculation of the "amount historically diverted" and "amount historically consumed" under § 85-2-408(7), MCA. The Department may then use these calculations to limit the amount of water an applicant may put to instream use under the authority granted to it by § 85-2-408(7), MCA. Where the applicant successfully has proven the requirements listed under §§ 85-2-402(2) and -408(3), MCA, the Department may not refuse to grant a change of use solely on the grounds of the applicant's failure to "prove" the limitation articulated by § 85-2-408(7), MCA, because subsection (7) does not impose a burden on the applicant.

¶38 The Department concluded that Hohenlohes had failed to establish a lack of adverse effect to other right holders. The Department pointed specifically to Hohenlohes' failure to

15

analyze the historic volume of water consumed by the crop or how the diverted water not consumed by the crop had returned to the source. The Department relied on § 85-2-408(7), MCA, to determine that Hohenlohes were entitled to change to instream use only that portion of their water right that historically had been consumed. The Department denied Hohenlohes' application in large part based on Hohenlohes' failure to establish by a preponderance of the evidence the volume of historic consumptive use.

¶39    Section 85-2-408(7), MCA, dictates that the amount of water historically diverted represents the maximum amount of water that may be protected instream to benefit the fishery. The provision further provides, however, that the maximum quantity of water that may be used to maintain or enhance streamflows below the existing point of diversion is the "amount historically consumed, or a smaller amount if specified by the department." Section 85-2-408(7), MCA. We recognize the potential contradictions posed by these provisions. Hohenlohes' application demonstrates both the difficulty of accurately determining the amount historically consumed, and the large discrepancy that may exist between historic diversion and consumption. This discrepancy may render impossible the satisfaction of both provisions of § 85-2-408(7), MCA.

¶40    We act under an affirmative duty to interpret statutes so as to give effect the underlying legislative intent. *Delaney & Co. v. City of Bozeman*, 2009 MT 441, ¶ 22, 354 Mont. 181, 222 P.3d 618. Statutory construction "should not lead to absurd results if a reasonable interpretation can avoid it." *Bitterroot River Protective Ass'n v. Bitterroot Conserv. Dist.*, 2008 MT 377, ¶ 72, 346 Mont. 507, 198 P.3d 219. To read § 85-2-408(7),

16

MCA, as allowing the Department to approve a change of use application for the amount historically diverted, the amount historically consumed, or a lesser amount, as determined by the Department, gives effect to all of the words of the statute and to legislative intent. This interpretation also comports with the Department's own past interpretations of the phrase "amount historically consumed."

¶41    The Department deviated from its own prior interpretation of § 85-2-408(7), MCA, in denying Hohenlohes' application. *See e.g. Authorization Nos. 76F-30023056, Mannix Lease* (2007), and *76F-30011112, Hoxworth Lease* (2005). Moreover, the Department has conflated the subsection (7) consumptive use language with the showing of no adverse effect required by §§ 85-2-402(2) and -408(3), MCA. As a consequence, the Department reasoned that the determination of historic consumptive use comprised part of the applicant's burden to show, by a preponderance of the evidence, that the proposed change would inflict no adverse effect on the water rights of other users.

¶42    Within the parameters set by § 85-2-408(7), MCA, return flow and historic beneficial use present related issues in the context of a change of use application for instream flow. The question of adverse effect under §§ 85-2-402(2) and -408(3), MCA, implicates return flows. A change in the amount of return flow, or to the hydrogeologic pattern of return flow, has the potential to affect adversely downstream water rights. There consequently exists an inextricable link between the "amount historically consumed" and the water that re-enters the stream as return flow. The Department defines "return flow" as that part of diverted flow that is applied to irrigated land and is not consumed, but returns

17

underground to its original source or another source, "and to which other water users are entitled to a continuation of, as part of their water right." Admin. R. M. 36.12.101(56).

¶43 An appropriator historically has been entitled to the greatest quantity of water he can put to use. *Sayre v. Johnson*, 33 Mont. 15, 18, 81 P. 389, 390 (1905). The requirement that the use be both beneficial and reasonable, however, proscribes this tenet. *In re Adjudication of Existing Rights to the Use of All Water*, 2002 MT 216, ¶ 56, 311 Mont. 327, 55 P.3d 396; *see also* § 85-2-311(1)(d), MCA. This limitation springs from a fundamental tenet of western water law—that an appropriator has a right only to that amount of water historically put to beneficial use—developed in concert with the rationale that each subsequent appropriator "is entitled to have the water flow in the same manner as when he located," and the appropriator may insist that prior appropriators do not affect adversely his rights. *Spokane Ranch & Water Co. v. Beatty*, 37 Mont. 342, 351, 96 P. 727, 731 (1908).

¶44 This fundamental rule of Montana water law has dictated the Department's determinations in numerous prior change proceedings. *See e.g. In the Matter of Application for Change Authorization No. G(W)028708-411 by Hedrich/Straugh/Ringer*, Final Order (Dec. 13, 1991); *In the Matter of Application for Change Authorization No. G(W)008323-g76L by Starkel/Koester*, Final Order (Apr. 1, 1992). The Department claims that historic consumptive use, as quantified in part by return flow analysis, represents a key element of proving historic beneficial use.

¶45 We do not dispute this interrelationship between historic consumptive use, return flow, and the amount of water to which an appropriator is entitled as limited by his past

18

beneficial use. The amount of return flow analysis required will vary, however, with the facts of a particular case and the potential for adverse impact to downstream users. The potential for adverse impact to downstream users appears negligible in the context of Hohenlohes' change application. The Department nonetheless cited Hohenlohes' failure to provide a "complete" analysis of return flows in support of its denial. Without such an analysis, the Department argued, it was unable to ascertain whether Hohenlohes had met the requirements of §§ 85-2-402 and -408, MCA, or to determine whether Hohenlohes successfully had proven lack of adverse effect.

¶46    The Department based its denial—and its determination that a "complete" return flow analysis was required—on an overly narrow reading of § 85-2-408(7), MCA. The Department argued that the phrase "the amount historically consumed" limits the amount of water that may be protected instream to the water that had been lost to plant consumption (evapotranspiration). The District Court disagreed. The court observed that in many cases large volumes of water may be diverted that are not lost to evapotranspiration, yet never return to the protected reach. The District Court determined that the Department's reading of "the amount historically consumed," in the context of Hohenlohes' application, conflicted with its prior applications of that provision and with the plain language of the statute. The Department's own definition of consumptive use makes clear that return flow represents only one variable—albeit an important variable—in the calculation of consumptive use. In addition to evapotranspiration, consumptive use includes direct evaporation from soils or

water surfaces and any water incorporated into vegetation or that otherwise does not return to ground or surface water. Admin. R. M. 36.12.101(15).

¶47 The Department does not contest the District Court's determination on the definition of "the amount historically consumed." The Department argues instead that in prior cases in which it accepted the full diverted volume as the volume to be protected instream, the applicant had provided a "complete return flow analysis." The Department raises the specter of a water right holder using the instream flow change provisions to bootstrap a larger amount of water for a consumptive purpose. We already have determined that the temporary change provisions of the Water Use Act provide adequate insurance against such an outcome. Section 85-2-407(6), MCA. This bootstrapping concern, therefore, can no more constitute the sole grounds for limiting the quantity of Hohenlohes' diverted water right that may be put instream to benefit the fishery than it can justify the outright denial of their application.

¶48 As we have noted, prior change of use decisions by the Department have allowed for the full diverted volume to be protected as instream flow under similar circumstances. *Authorization Nos. 76F-30023056, Mannix Lease* (2007), and *76F-30011112, Hoxworth Lease* (2005). The Department approved these change of use applications for the entire diverted amount even in cases where the return flow historically had been lost to the protected reach, but returned downstream of it. These approvals reflected the policy and purpose of the Water Use Act, which aims to "encourage the wise use of the state's water resources," and to seek "the stabilization of streamflows." Section 85-2-101(3), MCA. They

further reflected a rule that the Department asserts here against Hohenlohes, that Montana water law does not discriminate among uses. Section 85-1-101(4), MCA. An applicant who wishes to change his point of diversion or to change to a more efficient form of irrigation and thereby irrigate a larger acreage is entitled—on making the required statutory showing—to make use of the historically diverted amount. Section 85-2-402(2), MCA.

¶49 It is untenable that a change of use applicant who incurs the considerable expense of installing a more efficient irrigation system in order to leave water instream—a beneficial use equal to any other recognized by the Montana Constitution—thereby risks losing a significant portion of the water he would have been allowed to divert had he continued to irrigate in an inefficient manner. Such an outcome frustrates the purpose of the instream flow statute, and does little to "encourage the wise use of the state's water resources." Section 85-2-101, MCA.

¶50 Hohenlohes submitted information as to historic diverted use and ditch capacity. Hohenlohes claimed a historic diverted volume of 4,682.7 AF based on their alleged diversion rate of 32.5 cfs. Hohenlohes' change application sought a combined use of 4,342.44 AF that included both irrigation and instream flow. Hohenlohes performed a return flow analysis for the 200-foot section below their point of diversion on Little Prickly Pear Creek that they had defined as the "protected reach." Hohenlohes did not analyze how 4,342.44 AF of water historically had returned to the Missouri River.

¶51 The regulatory framework provides applicants with a variety of methods to establish historic use. *See* Admin. R. M. 36.12.1902(9). Hohenlohes produced the available historic

21

documentation. By doing so, Hohenlohes established the maximum quantity of water that § 85-2-408(7), MCA, entitles them to convert to instream flow. The Department then should have focused its analysis on whether Hohenlohes' conversion of this maximum amount of water to instream flow would affect adversely other right holders. Sections 85-2-402(2) and -408(3), MCA.

¶52 Hohenlohes point out that no practical difference exists for upstream water right holders—all are junior appropriators in this case—between their use of all 32.5 cfs for flood irrigation versus their use of 3.5 cfs for sprinkler irrigation and their leaving the remaining 29 cfs in the waterway. We agree. The effect of a call for an upstream junior would be the same regardless of whether Hohenlohes put the water back into Little Prickly Pear Creek or continued to divert it. Return flows from Hohenlohes' property would have no effect on upstream users on Little Prickly Pear Creek.

¶53 The sole downstream user on Little Prickly Pear Creek—Lahti—initially filed an objection to Hohenlohes' application. Lahti, as the sole downstream user, posed the most likely potential candidate to suffer adverse effect from Hohenlohes' change of use application. Lahti withdrew her objection on May 31, 2007, pursuant to a settlement agreement with Hohenlohes, before the case proceeded to a contested case hearing. Lahti determined that Hohenlohes' proposed change to instream flow in fact had increased her water supply. The Department's own analysis supports Lahti's determination.

¶54 The Department contends that the topography of the acreage historically irrigated indicates that much of Hohenlohes' diverted water actually returns directly to the Missouri

22

River above the confluence with Little Prickly Pear Creek, rather than to Little Prickly Pear Creek itself. This water under natural circumstances, of course, would remain in Little Prickly Pear Creek and augment the flow available to downstream users such as Lahti. Hohenlohes' decision to leave the water in Little Prickly Pear Creek to enhance instream flow would produce the same outcome—more water available in Little Prickly Pear Creek than if Hohenlohes continued to divert the water. By the Department's own admission, Hohenlohes' return flow goes directly to the Missouri River to the detriment of downstream users on Little Prickly Pear Creek.

¶55 The Department argues that the mere absence of objections by other right holders does not necessarily equate with a determination that the applicant has met the statutory criteria to prove lack of adverse effect. The Department fails to explain how the requirement of a "complete" return flow analysis applies where no downstream users depend on return flow to trigger analysis under Admin. R. M. 36.12.1903(2)(d). In this case, where Hohenlohes have applied for a change of use to instream flow on the lower reaches of a small tributary, and satisfactorily have established lack of adverse effect to other users, the Department abuses its discretion by requiring more than is necessary to meet the statutory criteria. The Department undoubtedly possesses the discretion to require a more or less comprehensive return flow analysis depending on circumstances. This discretion does not exist in a vacuum, however, and the degree of analysis required in a given situation will vary according to the underlying facts. The Department admits that "[i]n some cases an amount need not even be calculated."

¶56     The Department's definition of a "complete" return flow analysis in this case appears to be unlimited in scope. The Department's requirement, moreover, would extend to all potential users with points of diversion falling within the path of water that would—under natural stream conditions—never leave Little Prickly Pear Creek. The Department stresses the large amount of water claimed by Hohenlohes as justification for requiring an extensive return flow analysis, but appears to have lost sight of the fact that the return flow analysis serves to establish the statutory requirement of proving lack of adverse effect. The Department appears similarly distracted from the hydrologic significance of Hohenlohes' claimed diverted volume on Little Prickly Pear Creek. The Department instead fixates on the relatively negligible effect of Hohenlohes' proposed change of use on the flow of the Missouri River. Though the Department is entitled to—and indeed required to—consider both of these factors, it must not sacrifice the underlying statutory purpose to guard against a purely hypothetical bootstrapping.

¶57     Hohenlohes claim a flow rate of 32.5 cfs—enough, based on historical records, to have dewatered Little Prickly Pear Creek entirely. The Missouri River at the gauging station closest to the confluence with Little Prickly Pear Creek, by contrast, had an annual flow rate in 2009 of 23,376 cfs. The potential impact of returning 29 cfs of water to the fishery from which it was diverted—Little Prickly Pear Creek—would be significant. The potential harm from a reduction in return flow to the Missouri River would be negligible.

¶58     Hohenlohes argue that the Department should consider their claimed diverted amount of 4,342.44 AF as the amount of their historic consumptive use in the absence of an

24

objecting downstream user. The Department's own past interpretation of the phrase "the amount historically consumed" reflects the reality that under certain circumstances the diverted amount and consumed amount will, for all intents and purposes, be the same where no water historically had returned to the protected reach, and no downstream users are likely to be affected adversely.

¶59 The Department based its own calculations of what volume would constitute reasonable historic use on the Montana Irrigation Guide, while Admin. R. M. 36.12.1902(14) gives applicants a variety of options for calculating historic consumptive use. These options range from quantification of actual historic consumption using historic measurements, to proxy estimations for historic use based on crop, soil type, and region.

¶60 Proxy approaches such as the Montana Irrigation Guide—used here by the Department—and Natural Resources Conservation Services Irrigation Water Requirements, represent at best rough estimates of historic consumptive use. These estimates may prove useful for applications that seek to change from one consumptive use to another, or in cases where the potential for adverse effect on the rights of other users remains unclear. For instream flow applications on the lower portions of small tributaries where the applicant successfully has demonstrated no adverse effect to other users, however, such subjective estimates may serve to counteract the intent of the instream flow provisions by arbitrarily limiting the amount of water that may be protected to benefit fisheries. In fact, the Department's decision to limit the amount of water that a right holder may transfer from consumptive use to instream flow in such situations may have the anomalous result of

forcing an appropriator to continue with inefficient irrigation methods in order to preserve the full extent of his water right.

¶61 We agree as a general matter that the Department possesses the discretion to require return flow analysis to the extent necessary to determine lack of adverse effect. We are troubled, however, by the Department's failure to use its discretion in a consistent manner so as to provide instream flow change applicants with sufficient guidance as to the factual circumstances that will correlate with a given level of analysis. No bright line rule governs the scope of this analysis. The analysis will vary from one application and accompanying set of facts to the next. This inherent variability does not mean that the Department may act with impunity according to its own whims and without regard for the facts of a case or the underlying purpose and intent of the statute that it is empowered to uphold.

¶62 Here the applicant successfully has demonstrated by a preponderance of the evidence that no other users would be affected adversely by potential changes to instream flow. We agree with the District Court that the Department's denial of the application for want of a "complete" return flow analysis—without further explication and where it has granted similar applications in the past—constitutes arbitrary conduct under § 2-4-704(2)(a)(vi), MCA. Such conduct conflicts with the substantive mandates of the Water Use Act as a whole, and with the purpose and intent of the instream flow provisions in particular. Sections 85-1-101, 85-2-408, MCA.

¶63 Moreover, the Department's conduct ignores how the instream flow statute has worked in practice. The majority of the leases and conversions that the Department

26

processed during the initial ten-year period of the instream flow provisions have been on small tributaries. Mont. H. 308, Fish, Wildlife and Parks Comm. *Hearing on HB 308*, L. 2005, Reg. Sess. (Jan. 27, 2005) (Exhibit 10: *Private Water Leasing – A Montana Approach: A Report on the 10-Year History of a Unique Montana Program*, Trout Unlimited Report). The lower reaches of these small tributaries represent the preferred spawning habitat for most of the native fish species that inhabit the larger rivers of Montana. In addition, leases on the lower reaches of tributaries likely would prove more effective because they are less prone to diminution by a call from a downstream right holder. The instream flow statutes do not specify the size of water body to be targeted, but the practical reality of fish biology—and the legal reality of the prior appropriation system—dictate that the greatest benefit to the fishery will accrue from water being protected instream in the lower reaches of small tributaries.

¶64 Hohenlohes have demonstrated by a preponderance of the evidence that their proposed change of use to instream flow would not affect adversely the water rights of other users on Little Prickly Pear Creek. The Department has not identified any users on the Missouri River under Admin. R. M. 36.12.1903(2)(d) who potentially are "dependant on return flow" from Hohenlohes. The Department may not require Hohenlohes to establish that their proposed change of use would not affect adversely a hypothetical water right holder on the Missouri River—to do so imposes a heavier burden on the applicant than the statutory provisions warrant.

27

¶65    The Department's insistence that Hohenlohes submit an undefined "complete" return flow analysis overlooks this basic hydrologic fact, and thereby frustrates the purpose of the return flow statute. Hohenlohes submitted all of the available historic documentation as to historic use of the water rights they seek to change. Most importantly, Hohenlohes adequately demonstrated that it is "more likely than not" that their change of use will not affect adversely other users. Hohenlohes have satisfied the burden imposed by §§ 85-2-402(2) and -408(3), MCA, that their proposed change will not result in adverse effect to other right holders. The Department's denial of Hohenlohes' change application based on an alleged incomplete return flow analysis is arbitrary and constitutes an abuse of discretion under these circumstances. Section 2-4-704(2)(a)(vi), MCA.

C.    **The Department's Exercise of its Discretion Under § 85-2-408(7), MCA.**

¶66    The administrative record establishes that Hohenlohes demonstrated by a preponderance of the evidence under §§ 85-2-402(2) and -408(3), MCA, that their proposal to return to Little Prickly Pear Creek 29 cfs of the 32.5 cfs of water that they formerly had diverted would have no adverse effect on other right holders. Our determination that the Department abused its discretion in its handling of Hohenlohes' change application does not conclude the inquiry.

¶67    Hohenlohes' showing of no adverse effect established the maximum amount of water that they may convert to instream flow under the first provision of Section 85-2-408(7), MCA—"the amount historically diverted." The Department still possesses discretion under appropriate circumstances to limit or reduce that portion suitable for instream flow from "the

28

amount historically diverted" to "the amount historically consumed, or a smaller amount." Section 85-2-408(7), MCA. Section 85-2-402(8), MCA, likewise allows the Department to approve an application for a change in appropriation right "subject to the terms, conditions, restrictions, and limitations that it considers necessary to satisfy the criteria of this section."

¶68 Hohenlohes seek a broad ruling that would eliminate the Department's discretion. In this regard, Hohenlohes characterize consumptive use as a malleable concept that can be changed to accommodate unique factual situations. As a result, Hohenlohes argue that the Department should consider their full diverted amount of 4,342.44 AF as the amount of their historic consumptive use in the absence of an objecting downstream user.

¶69 Consumptive use actually represents a legally defined term within the context of the Water Use Act. "Consumptive use" constitutes the volume of water used annually for a beneficial purpose, "such as water transpired by growing vegetation, evaporated from soils or water surfaces, or incorporated into products *that does not return to ground or surface water.*" Admin. R. M. 36.12.101(15) (emphasis added). Hohenlohes' characterization of their historic use as both diversion and consumption conflicts with the regulatory provisions promulgated by the Department. The rule proposed by Hohenlohes improperly would constrain the Department under almost any circumstances from limiting the amount of water that an applicant may dedicate to instream use in future cases. Other change of use applications may present a greater potential for adverse effect to other right holders and we decline to adopt such a blanket rule here.

29

¶70     We recognize, however, that the Department's own past interpretation of the phrase "amount historically consumed," as contemplated by § 85-2-408(7), MCA, reflects the reality that under some circumstances the diverted amount and consumed amount will be the same. These circumstances likely will arise in situations where no water historically had returned to the protected reach, and no downstream users likely would be affected adversely. The Department properly exercises the discretion bestowed by § 85-2-408(7), MCA, to limit that amount of water that an applicant may dedicate to instream flow when questions arise as to whether a proposed change would affect adversely other right holders. These questions generally will arise in change applications in which some portion of the historically diverted water returns directly to the protected reach and in which identifiable downstream users potentially will be affected adversely by the proposed change of use.

¶71     The Department must evaluate, on a case by case basis, whether an instream flow application may be approved for the full historically diverted amount, the "amount historically consumed," or a smaller amount. The Department alleges in this case that past wasteful use by Kantorowicz, Hohenlohes' predecessor, accounts for the significant discrepancy between Hohenlohes' claimed diverted volume and the Department's calculated "reasonable" volume. The Department's engineer opined that Kantorowicz had "actually wasted water just because he could." The Department retains the discretion to take into account reasonable or wasteful use and to amend or modify a proposed change of use application according to those determinations. *See Bostwick*, 2009 MT 181, ¶ 21.

¶72    In exercising this discretion, however, the Department must not lose sight of the ultimate purpose of the instream flow statute—to restore water to streams for the benefit of the fishery resource. The Department must balance this purpose with the realistic likelihood of adverse effect to *existing* right holders. The Department further must bear in mind the fact that Hohenlohes' water rights remain subject to ultimate adjudication by the Water Court.

¶73    We deem it appropriate under the circumstances to reverse the District Court's order that directed the Department to grant summarily Hohenlohes' change of use application for the full diverted amount. The District Court's order sweeps too broadly and casts aside entirely the Department's discretion granted by § 85-2-408(7), MCA, to limit under appropriate circumstances the amount of water that a change of use applicant may dedicate to instream flow. The Department should evaluate in the first instance Hohenlohes' change of use application consistent with the principles set forth here.

¶74    In evaluating Hohenlohes' application, the Department further must comply with all applicable statutory procedures. For example, the Department issued its final order denying Hohenlohes' application 742 days after the objection deadline had passed. Section 85-2-310(1), MCA (2007). This same type of dilatory response prompted the Eighteenth Judicial District Court, Gallatin County, to grant the applicants a writ of mandate in *Bostwick*.

¶75    We reversed the district court in *Bostwick* solely on the basis that the Department's decision on a change of use application represents a discretionary action not subject to a writ of mandate. *Bostwick*, 2009 MT 181, ¶¶ 19-20. The Department cites *Bostwick*, however, for the proposition that this Court may not overturn its discretionary act in refusing to grant

31

Hohenlohes' change of use application. The Department reads a level of administrative immunity into *Bostwick* that does not exist in statute or case law. Our decision in *Bostwick* determined only that mandamus did not represent an available form of relief for the Department's completed discretionary act. *Bostwick*, 2009 MT 181, ¶ 19. We declined to "delve into the precise hydrological and scientific reasons" for the Department's denial because we did not reach the merits of Bostwick's claim. *Bostwick*, 2009 MT 181, n. 1. We in no way intended to condone the Department's procedural deficiencies.

¶76 The Department also refused to appoint a hearing examiner different from the Department employee who had evaluated Hohenlohes' application. The Department based its denial on the grounds that "Mr. Langel is the Department-appointed decision-maker with the most knowledge about the Application." We note that the legislature has seen fit to amend the hearing provisions at § 85-2-310, MCA, since Hohenlohes filed their complaint. Subsection (1)(b)(i) now provides specifically that the Department *shall* appoint a hearing examiner at the applicant's request "who did not participate in the preliminary decision." Section 85-2-310(1)(b)(i), MCA. Hohenlohes should receive the benefit of this subsequent legislative enactment on remand.

CONCLUSION

¶77 We reverse the District Court's order and remand to the Department for further proceedings consistent with this opinion. The Department either may approve Hohenlohes' application as presented, or it must grant Hohenlohes a new hearing on the amount of water

that Hohenlohes may dedicate to instream flow. A new hearing examiner must conduct any future hearings on this issue.

¶78     Justice Jim Rice recused himself after oral argument.

/S/ BRIAN MORRIS

We Concur:

/S/ MIKE McGRATH
/S/ W. WILLIAM LEAPHART
/S/ PATRICIA COTTER
/S/ JAMES C. NELSON
/S/ MICHAEL E WHEAT

Justice Michael E Wheat Concurs.

¶79     I concur in the Court's Opinion. I write separately to address four points.

¶80     First, while I recognize that the Department is not required by law to share information and coordinate with the FWP, in this case, it would have been appropriate and beneficial for the Department to do so. This is especially true because the State generally and FWP specifically had as much to gain from the change in water use as Hohenlohes. Hohenlohes received a grant from the FWP to convert 150 acres of their land from flood irrigation to sprinkler irrigation. Opinion, ¶ 5. This change resulted in significant water savings, all of which was used to increase instream flows and improve aquatic habitat. *Id.*

¶81    In my mind, when multiple state agencies are involved, the better course of action is for each agency to work with the other agencies that are involved to reach a result in the most efficient manner, using the most complete dataset available. This approach is bolstered by well-established public policy in Montana. It is the public policy of the State "to promote the conservation, development, and beneficial use of the state's water resources to secure maximum economic and social prosperity for its citizens." Section 85-1-101(2), MCA. The State "shall coordinate the development and use of the water resources of the state so as to effect full utilization, conservation, and protection of its water resources." Section 85-1-101(3), MCA.

¶82    With these mandates in mind, it would have benefitted all stakeholders—i.e. Hohenlohes, the Department, the FWP, and the general public—for the Department and the FWP to have communicated and shared information concerning Hohenlohes' change of use application. I hope that State agencies will find a way to coordinate their efforts in future cases like this so that all interested parties are involved in the process.

¶83    Second, I recognize that the law imposes on Hohenlohes an affirmative duty to prove the beneficial nature of their claimed historic use. Opinion, ¶ 43 (citing *In Re Adjudication of Existing Rights to the Use of All Water*, ¶ 56). Regardless of that duty, however, I observe that the Department went to great lengths to gather its own facts to evaluate Hohenlohes' application. The Department sent Jim Beck, a field engineer, to conduct an on-site investigation and generate calculations as to historic use. Opinion, ¶ 9. The Department

went so far as to expend its limited resources to gather information that would expand its understanding of the issues posed by Hohenlohes' application.

¶84 Once the Department took that step, the Department should have shared that information with Hohenlohes and supplemented the record accordingly. In fact, in my opinion, the Department was obligated to supplement the record with the information it had developed. Instead, the Department denied Hohenlohes' application for failure to meet their burden to prove lack of adverse effect, the extent of historic use, and historic consumption—all while the Department itself had data that it could have contributed to the record. The Department's actions with respect to this issue disregard the public policy mandate that the State "shall coordinate the development and use of the water resources of the state so as to effect full utilization, conservation, and protection of its water resources." Section 85-1-101(3), MCA. The Department's adversarial approach does not further the goal that all water resources of the State be put to optimum beneficial use.

¶85 Third, I recognize that under then-existing law, the Department was not required to appoint a new hearing examiner. Opinion, ¶ 76. That being said, the Department's obstinate approach to this issue lacks common sense and courtesy. It gives the impression that the Department did anything it could to avoid giving Hohenlohes a fair shake. Once again, the Department's actions paint it as an adversary that is not interested in effecting full utilization, conservation, and protection of Montana's water resources. The Department's obstinance in this case was both unfortunate and unnecessary.

35

¶86 Fourth, I agree with the Court's characterization of the Department's approach to Hohenlohes' application as "dilatory." Opinion, ¶ 74. In addition, I observe that the Department's delay and adversarial attitude forced Hohenlohes to bear a heavy burden. Most applicants in Montana would not have been able to afford to see this process through to the bitter end. I recognize that the Department is underfunded—as nearly every State agency is during hard (and even good) economic times—but the Department's drawn-out process will prevent all but the most fortunate and persistent from pursuing and litigating change of use applications. I urge the Department to reconsider its approach so that all Montanans may pursue optimum beneficial use of water resources.

¶87 I concur.

/S/ MICHAEL E WHEAT

Justice James C. Nelson joins in the foregoing concurrence.

/S/ JAMES C. NELSON